HUNTER DOUGLAS CORPORATION, Appellant,

v.

LANDO PRODUCTS, Inc., Appellee.

LANDO PRODUCTS, Inc., Appellant,

v.

HUNTER DOUGLAS CORPORA-TION, Appellee.

No. 13372.

United States Court of Appeals Ninth Circuit.

June 14, 1956.

Flehr & Swain, John F. Swain, San Francisco, Cal., for appellant.

Donovan O. Peters, Charles F. Hutchins, Jr., San Francisco, Cal., Pennie Edmonds, Morton, Barrows & Taylor, Merton S. Neill, Daniel V. Mahoney, New York City, for appellee.

Before BONE, ORR and LEMMON, Circuit Judges.

LEMMON, Circuit Judge.

Strong almost to the point of vehemence is the expression "clearly erroneous". An appellate court should bear this in mind when it applies Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., which provides that "In all actions tried upon the facts without a jury * * * [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

Too often appellate courts give only lip-service to the rule that, "Having seen and heard the witnesses, the trial judge is in a better position than an appellate court to pass upon the facts." Too often reviewing tribunals are tempted to substitute their own fact-judgments for those of the courts of first instance.

This is a pit into which this Court, with more or less success, has always endeavored not to fall. In the instant case, it is somewhat easier to avoid the snare, since we are inclined to agree with the findings of the trial court.

### 1. Statement of the Case

When this case was previously before us we affirmed that part of the judgment holding invalid a patent involved in the action, and vacated that portion of the judgment dismissing Lando's counterclaim. The case was remanded to the trial court with "directions to enter consistent Findings of Fact and Conclusions of Law on the issues of the existence of tie-in sales and the damages, if any, suffered by Lando on its Counterclaim." Hunter Douglas Corp. v. Lando Products, Inc., 9 Cir., 1954, 215 F.2d 372, 376.

Following remand the trial court filed "Amended and Supplemental Findings of Fact and Conclusions of Law". In these findings the court stated "accordingly the counterclaim is dismissed". It is from "that part of the Amended and Supplemental Findings of Fact * * * (and which constitutes a final judgment), which provides 'accordingly the counterclaim is dismissed'", that, as Lando Products, Inc., hereafter "Lando", states in its notice of appeal, the present appeal is taken.

■■ Assuming that the trial court intended this statement in the findings of fact to be a final judgment dispositive of the counterclaim, we hold that it is beyond that court's jurisdiction. The per-

fection of the original appeal herein operated to transfer to the Court of Appeals jurisdiction of the cause; the jurisdiction of the trial court ceased and that of the Court of Appeals attached. The trial court was thereafter without authority to act in matters relating to the subject matter until the mandate was returned.[1] In this case the mandate did not authorize the trial court to enter a judgment. The mandate contemplated no new decree. Any attempt to do so is void and of no effect.

This court vacated a part of the original judgment and remanded the case for a restricted and limited purpose. Such was accomplished by the filing of the amended and supplemental findings of fact. We conclude that these further findings are adequate to support the judgment on the counterclaim in this action originally appealed from, and this court has a retained jurisdiction arising from the original appeal to consider any attack now made upon the original judgment on the counterclaim, including the contention that the evidence does not support the findings. This we will proceed to do.

Lando alleged in its counterclaim that Hunter Douglas Corporation, hereinafter Hunter, violated the Federal Antitrust Laws and that as a result of this violation Lando suffered injury in its business and property. Damages and an injunction are prayed for. See 15 U.S.C.A. §§ 15 and 26.

In summary, the violation charged is that, during the period of time from the middle of 1949 to the middle of 1950, Hunter, being the only manufacturer of patented plastic Venetian blind tape, as a condition of sale of such tape, required purchasers to buy unpatented aluminum Venetian blind slat stock. It was further alleged that Lando, which makes Venetian blind slat stock but not tape, lost sales of slat stock. Illegal tie-in sales were thus alleged as the substance of the counterclaim.

In the original judgment, the counterclaim was dismissed. Having found that the "amended and supplemental findings of fact" support the judgment on the counterclaim, we now address our attention to the problem of whether the evidence supports the findings.

Summarized, the "Amended and Supplemental Findings of Fact" are as follows:

Lando did not prove any actual tie-in sales made by Hunter.

During 1950, the period in question, Lando's mill was operating "at close to capacity".

During 1950, Lando's mill was operating with a greater volume of metal strip produced and a larger number of employees than in 1949.

Lando has made no showing that its plant could have handled additional orders, nor has it established that it has been damaged by any of Hunter's activities.

The findings also contain monthly tables of figures, showing that, with the exception of April, 1950, the footages produced, and the values thereof, in 1950 were greater than for the corresponding months of 1949. Similarly, there is a table reflecting the fact that, with the exception of March and April of 1950, the number of employees in Lando's rolling mill and paint lines in 1950 was greater than for the corresponding months of 1949.

Lando specifies seventeen errors, but summarizes them in four groups, which will be considered *seriatim*.

2. *There Is Substantial Testimony Adduced by Lando Itself To Support the District Court's Finding That 1950 Is the Period for Which Lando Claims Damages.*

Lando specifies as error that "The Court erred in finding that the year 1950 was the period for which the defendant claims damages." It is contend-

---

1. United States cases cited in 4 C.J.S., Appeal and Error, § 607, p. 1092, note 42.

ed that the correct period is "from July 1, 1949, to June 30, 1950."

■ While it is true that the counterclaim states that "Beginning in or about June 1949", etc., the following testimony by Ellis A. Lando, president and, with Mrs. Lando, the principal stockholder of the corporation, indicates that there was substantial basis for the Court's finding of 1950 as the critical year:

"During the year of 1949 our sales in [the area of the northwest] was [sic] $50,458.64. That is the latter part of this month, the month will show—I should say the latter part of the year, and these months will show it, that this competition caused us to lose business. In January, February—or I should say February—January, February, March and April of *1950*, and then we were completely out of the area, we had a total sales of $4,614.44. In other words, *we went from a year of $50,000 in 1949 to $4,000 in 1950.*" [Emphasis supplied.]

Elsewhere in his testimony, Mr. Lando said that "Our sales dropped in the last part of '50 to nothing."

Furthermore, Lando itself does not adhere to its own pleadings when it now claims that the critical period *terminated* on June 30, 1950. Lando's counterclaim alleges that the period in question continued "up to and including the date of the filing of this Counterclaim". The counterclaim was filed on *August 30, 1951.*

Lando's testimony shows that its real claim is for damages actually alleged to have been sustained during the year 1950.

At any rate, there is substantial evidence, adduced by Lando itself, that Lando did not suffer any damage from July 1, 1949, to December 31, 1949, inclusive.

3. *Whether Lando's Mill Was Operating at Capacity or Whether It Could Have Handled Additional*

*Orders Is Not Determinative of This Case.*

Lando devotes considerable argument to the question of whether its mill was operating to capacity. The principal question before us, however, is not whether the mill was operating at a maximum, but, in appellant's own words, "Did Lando lose sales which it otherwise would have made" because of Hunter's acts?

These alleged acts we will next consider. For the present, we need only recall that Finding 23, which, in Lando's own words, "relates to specific production figures as to which there is no dispute", shows that the footages produced at Lando's mill, and the value thereof, were far greater during the crucial year of 1950 than during the preceding year. And the same is true of the number of Lando's employees in its rolling mill and paint lines in 1950, as compared with 1949. This is shown in a table included in Finding 24, which Lando itself characterizes as "a statement of ultimate fact and is taken from an exhibit introduced in the case and no party has any quarrel therewith".

■ 4. *There Is Substantial Support in the Record for the District Court's Finding That Lando Did Not Prove Illegal Tie-in Sales By Hunter.*

At the trial of this case Lando introduced a group of photostats marked Exhibit B, which were obtained from the Clerk of the United States District Court at Los Angeles, California, in a Government Anti-Trust action against Hunter, Civil Action No. 13236-PH. In its opening brief, Lando relies heavily upon this exhibit, asserting that:

"After the oral hearing on the prior appeal in this matter a Consent Decree enjoining tie-in sales was entered in the Los Angeles suit (on June 30, 1954)," etc.

Lando's brief, however, fails to state that the Consent Decree, in its very

opening sentence, specifically recites that it was "entered without trial and without adjudication of any issue of fact or law herein, and without this Final Judgment constituting any *admission or adjudication* in respect to any such issue." [Emphasis supplied.]

Lando also stresses the testimony of a number of Venetian blind manufacturers "and others in the field" as tending to prove Hunter's illegal tie-in sales. Analysis of their testimony convinces us that the trial judge was justified in disregarding it.

Joseph E. Hirschbein testified that "For a while" he bought *all* his materials from Hunter. Later, on recross-examination, he stated that "If I said 'all of it,' I think I was possibly off. We bought most of it," for a "Period of two or three months."

W. C. Richards testified that early in 1950 he could buy plastic tape "providing I took a certain specified amount of Flexalum [Hunter] slats and provided that I did not use it on any other material than Flexalum slat blinds." After "A year or a year and a half" he "was cut off", and Richards bought his slat material from Lando. On cross-examination, he agreed that "from a price standpoint and other standpoints * * * Flexalum slat material is a premium material." The witness sold all blinds under his own trademark— "Custom-built Venetian Blind"—and, as Hunter points out, the latter had the right to choose the dealers it would permit to use its trademark. Richards' failure to use the trademark with Flexalum material was a legitimate reason for declining to do business with Richards.

Wilbur B. Fountain, Hirschbein's sales representative and general assistant, at first agreed that Hunter "insisted that this Flexalum plastic tape be used with Flexalum coil stock when the department stores, such as the Emporium or Lachman Brothers, was [sic] going to advertise Flexalum Venetian blinds". The question was repeated, hence there can be little doubt that Fountain, who occupied a position of responsibility, understood it. Yet when counsel for Lando, which had called Fountain as a witness, asked the latter whether he sold a blind "under the Hunter Douglas trademark of Flexalum", Fountain answered in the negative. Similarly, when Lando's attorney, in a patently leading question, suggested—

> "So that even though you didn't sell your Venetian blind as a Flexalum blind, so we will understand, you still had to buy the coil stock from Hunter Douglas in order to use their tape in that blind?"—

Fountain gave the suggested affirmative answer.

The reach of the Clayton Act, 15 U.S.C.A. § 12 et seq., does not extend to every remote, possible, or conjectural "lessening of competition". In Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 356–357, 42 S.Ct. 360, 362, 66 L.Ed. 653, the Court said:

> "Section 3 [of the Clayton Act, 15 U.S.C.A. § 14] condemns sales or agreements where the effect of such sale or contract of sale 'may' be to substantially lessen competition or tend to create monopoly. It thus deals with consequences to follow the making of the restrictive covenant limiting the right of the purchaser to deal in the goods of the seller only. *But we do not think that the purpose in using the word 'may' was to prohibit the mere possibility of the consequences described.* It was intended to prevent such agreements as would under the circumstances disclosed probably lessen competition, or create an actual tendency to monopoly. *That it was not intended to reach every remote lessening of competition is shown in the requirement that such lessening must be substantial.*" [Emphasis supplied.]

In the instant case, Lando has specified that the period for which it claims damage is a single year. Ivan S. Brownson, Hunter's sales manager, testified

that "We restricted the sale of tape only so long as we had a shortage." "It was only a temporary policy and was so stated." Brownson further testified *that even Flexalum distributors and promoters and those who were buying Flexalum* slat stock could not get all the tape that they needed:

"\* \* \* we tried our best to see that Flexalum distributors who assembled these blinds and promoted it in the field had, to the best of our ability, a supply of as much tape as was needed.

"However, it was a long time before we got to that point. During that particular period I think our records would show we were only about half that good, that the purchases were in relation to about half that much tape to their slat stock."

If Brownson's testimony is believed, it would be difficult to spell out a violation of the Clayton Act.

### 5. *There Is Support in the Record for the District Court's Finding That Lando Was Not Damaged by Any of Hunter's Activities.*

Ellis A. Lando, who controls the corporation's policies, on direct examination testified, as we have seen, that "Our sales dropped in the last part of '50 to nothing". When confronted with the exhibit showing more employees during 1950 than in 1949, Mr. Lando admitted that the figures did not support his statement that "Of course when you don't have the sales to do that [to work "in three shifts, around the clock"], you have to lay off your help". He offered this explanation for the seeming contradiction:

"\* \* \* the explanation that I tried to tell you, that these men could have been working on the mill or could have been working at another work."

Even Lando's own counsel tacitly concedes that this was an "explanation" that didn't explain, by characterizing it as "An isolated instance of confusion [that] does not establish lack of credibility."

Still elsewhere in his testimony, Mr. Lando's explanation for his Company's increased business during "the last part of '50" reached even farther than the men working on his mill. It reached as far as Korea! Mr. Lando testified:

"If I can say here too, your Honor, in explanation of increased sales here during the year of 1950— in 1949 we had one paint line; in other words, we were—all we were able to deliver was what we could paint on this one particular paint line. In November 5, 1949, we had a second paint line put into operation, which of course gave us more material to sell. And in August— September, I should say, 18th of 1950, we completed the third paint line. Also in the month of June of 1950 this Korean incident started, and of course everybody in the Venetian blind business had gone— no, I shouldn't say everybody, but practically all of the people that had been in this business during the Second War had the experience of not being able to buy enough material; so consequently, when this thing came along, everybody bought material at wild. And of course we could sell our aluminum during the latter part of 1950; we could have sold it to them, to anybody, regardless if we had plastic tape or if we did not have plastic tape."

Finally, confronted with his earlier testimony about laying off help, quoted above, Mr. Lando retorted:

"Mr. Mahoney, because you cut in and forced us down in one location is no reason we can't reach out in another direction and secure more business. You drove us into territories that we were never in before. We were never in Dallas before; we were never in Pennsylvania before; we were never in Atlanta before; we were never in New York before."

Taking this latter bit of Mr. Lando's testimony at its face value, we might be led to the conclusion that Hunter's alleged tie-in policies really had a salutary effect on Lando's business: it caused that business to expand into faraway places!

Quite aside from all this, however, it may be observed that perhaps the tangled skein of confusions and apparent contradictions in the testimony of Lando witnesses can be unraveled, and in some instances even explained away. We believe, however, that it is better to leave such a task to the sophistication of an experienced trial judge, who has seen and heard the witnesses, than to an appellate court, which has before it only the cold record.

Much is said in the briefs regarding a canceled Sears-Roebuck contract. Indeed, Lando insists that there were *two* such contracts. Its claim regarding the first, however, is based upon a letter, dated October 26, 1949, that *Mr. Lando* wrote to E. W. Elliot, whom he described in his testimony as "the Manager of the Venetian blind department" of Sears, Roebuck & Co. This letter contains Mr. Lando's recital of "my understanding of the agreement we reached on my recent visit to your office in Chicago," and could well have been disregarded by the District Judge. There is no explanation why Mr. Elliot himself was not called by Lando to corroborate Mr. Lando's testimony.

The second contract is supported by documentary evidence. It was denominated a "Contract of Purchase", and was dated April 28, 1950. The contract showed that its "Total Estimated Value", or, as Mr. Lando called it, its face amount was $147,562.50. He also testified that "the net result of this contract was we shipped them during May one car, July another one, and August two, for a total sales of $66,854.39."

According to Mr. Lando's testimony, "The result was that this contract, we got a cancellation through in amount of $80,714.78." [2] The cancellation was dated September 27, 1950. Mr. Lando, however, was not damaged by the cancellation: his own testimony establishes, beyond cavil, that he benefited from that abrogation:

"Q. And the contract was terminated in September of 1950? A. Yes, sir.

"Q. And you have told us that at least by August of 1950 we had what we call a seller's market. You could sell all you could produce? A. I believe so.

"Q. And as a matter of fact on these sales during September, October, and November of 1950, shown in Exhibit 54, didn't you in fact get a better price than you would have gotten if you had had to fulfill the Sears contract? A. We did, yes.

"Q. So that your mills were producing during those months practically to capacity, and you were able to sell the stuff to somebody else at a better price than your Sears Roebuck contract called for? A. That is right."

Finally, Plaintiff's Exhibit 54, which Lando itself asserts is "The only evidence in the case relating to Lando's capacity" and "production", shows that the footage produced in 1950, the crucial year, was nearly double that of 1949; that the "sales footage" in 1950 was *more* than double; and the sales in dollar value were almost double in 1950 as compared with 1949.

■ The Clayton Act requires that injury must be proved before recovery can be had. Section 15 of 15 U.S.C.A. provides:

"Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the

---

**2.** This figure is borne out by the record, but does not tally with the amounts given by Mr. Lando earlier in his testimony: $147,562.50 minus $66,854.39 equals $80,- 708.11, or a few dollars less than the figure in an exhibit and in Mr. Lando's own later testimony.

defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee."

In Wolfe v. National Lead Co., D.C. Cal., 1953, 15 F.R.D. 61, 63, affirmed, 9 Cir., 1955, 225 F.2d 42⁷, 434, certiorari denied, 1955, 350 U.S. 915, 76 S.Ct. 198, District Judge Goodman said:

> "The infirmity of plaintiffs' contention arises, in some degree at least, from a misapprehension as to the difference between a 'public wrong' and a 'private wrong' under the anti-trust laws. By § 1 and § 2 of Title 15, agreements, contracts or conspiracies as to forbidden practices are made public wrongs and may be dealt with accordingly. *Damage* to a private person caused by violation of § 1 or § 2 is a 'private wrong.' 15 U.S.C.A. § 15. A private person has no right to complain of a violation of § 1 or § 2, as such, nor does such a violation per se give rise to a private cause of action. [Case cited.] It is only when a violation of § 1 or § 2 causes *damage* that a cause of action inures to private benefit and then only to the extent of the trebled amount of such damage. Consequently, forbidden acts cannot be relevant unless they *cause* private damage."

In affirming the Wolfe case, we observed:

> "We concur in the views which were expressed by the trial court in dismissing the case. Appellants failed to prove injury resulting from the conduct of appellees."

In Burnham Chemical Co. v. Borax Consolidated, Ltd., 9 Cir., 1948, 170 F.2d 569, 578, certiorari denied, 1949, 336 U.S. 924–925, 69 S.Ct. 655, 93 L.Ed. 1086, rehearing denied, 1949, 336 U.S. 955, 69 S.Ct. 878, 93 L.Ed. 1109, motion for extension of time within which to file second petition for rehearing denied, 1949, 337 U.S. 961, 69 S.Ct. 1529, 93 L.Ed. 1760, Judge Bone said:

> "* * * (g) finally, giving a private individual a right to recovery does not enlarge the right of a private plaintiff since he must show personal pecuniary damages, his right of action being personal and for his own benefit and not (also) for the benefit of the public * * *. The public interest is vindicated by a criminal prosecution while the suit for damages merely redresses the private injury."

### 6. *Conclusion*

Bearing in mind that a judicial opinion is not a brief, we have not entered into a minute discussion of the thousand-page transcript or of Lando's ingenious though somewhat labored arguments in support of its Counterclaim.

Suffice it to say, after a careful study of the record, the exhibits, and the briefs, we hold that there is substantial basis for the District Court's finding that Lando "did not establish the fact that it had been damaged by any of [Hunter's] activities".

Accordingly, that part of the District Court's original judgment dismissing Lando's Counterclaim is affirmed.