Chester WOOTEN, Sheriff of Plaque-
mines Parish, Louisiana, et al.,
Appellants,

v.

John B. OHLER, an individual, et al.,
Appellees.

No. 19284.

United States Court of Appeals
Fifth Circuit.

June 6, 1962.

Sidney W. Provensal, Jr., of Cahn & Provensal, New Orleans, La., for appellants.

Victor H. Hess, Jr., Jackson & Hess, New Orleans, La., for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

This is an appeal from the granting of a preliminary injunction against a Louisiana Sheriff and his deputies, restraining them from interfering in any manner with peaceful picketing by union members. The injunction was granted on the grounds that the Sheriff had violated constitutional rights guaranteed by the Fourteenth Amendment and protected by the Civil Rights Statutes. Jurisdiction was determined to rest on 28 U.S.C.A. § 1343(3); 42 U.S.C.A. §§ 1981–1984. Specifications of error challenge this conclusion of law, and also bring into question the jurisdiction of the trial Court, and the propriety of the issuance of the injunction.

■ Finding no abuse of discretion by the trial Court, we affirm the issuance of the preliminary injunction. Because of the importance of the issues involved, and because the office of the preliminary injunction is merely to preserve the status quo pending a final determination of the rights of the parties involved, there should be a full hearing on the merits without delay.

So often simple facts generate complex legal questions of far-reaching importance. Such is the case here. Simply stated, Chester Wooten, Sheriff of Plaquemines Parish, Louisiana, made and enforced the rule in his bailiwick that "there was to be no picketing around there" of any non-union or open shop plant. Members of the Union, desiring to continue their peaceful picketing to publicize their grievances, sought and obtained the present injunction.

Houston Construction Company was engaged in the constructing of a gas compressor station for Tennessee Gas Transmission Company at Happy Jack, Louisiana, in Plaquemines Parish. The root of the present suit is the fact that the Company had no labor contract and refused to enter into any agreement or negotiations with the Union. The Petitioners [1] are members of the Union,[2] which is affiliated with the Building and Construction Trades Council of New Orleans and Vicinity.[3]

On July 10, 1961, the Executive Secretary of the Council met with the Company's superintendent and attempted to negotiate a labor agreement. The offer

1. John B. Ohler, Raymond Melvin, James A. Terrell, and J. J. McQueen.

2. Local 60, United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry, AFL–CIO. None of the employees of the Company were members of this Union.

3. This labor organization will be referred to as the Council.

was flatly refused with the statement that the job was a non-union, open shop job. Thereafter the Council contacted the Tennessee Gas Transmission Company, but was informed that the matter of a union agreement between the contractor and its employees was solely in the hands of that Company.

Failing in its efforts to obtain a labor agreement, the Council authorized picketing with a sign which read:

"Houston Construction Company does not have a written agreement with the Building and Construction Trades Council of New Orleans and Vicinity, AFL-CIO."

Two of the Petitioners established a picket line at the Happy Jack construction site on the morning of August 1, 1961. The picketing was entirely peaceful. The pickets walked only on the shoulder of the public highway, did not encroach upon private property, made no effort to obstruct ingress or egress to or from the job by workers, other persons or vehicles, and engaged in no conversation with anyone save the Deputy Sheriffs. Their "message" was confined to their own presence and the single sign. Within a couple of hours two armed Deputies showed up. These officers in words of plain meaning revealed the reason for the Sheriff's actions: "Well, boys, this is no union job and Sheriff Wooten has given me orders that you'll have to move on."

On the morning of August 3, 1961, a similar picket line was established. But this time the picketers were under arrest within 15 minutes on a charge of disturbing the peace. One Deputy testified that he had called for the two Deputies who made the arrest "under the instructions of Sheriff Wooten * * *" that "There was to be no picketing around there * * *." The sole motivation for this forcible interference was made doubly clear by the officers during the ride to jail. "You all," the Louisiana Deputy said, "were warned not to picket. This is a non-union job and no picketing is allowed." And then as a sort of gentle reminder that this was simply retribution, he added, "You were warned not to picket."

On August 31, 1961, after a hearing, the preliminary injunction [4] was issued against the Sheriff and his Deputies. The hearing by express consent was on affidavits of the plaintiffs, brief oral cross examination of a few of them, and the oral testimony of one Deputy Sheriff.

■■ At the outset, and as done so many times recently, we find it appropriate to emphasize the limited scope of review of a preliminary injunction. See Dronet v. Tucker, 5 Cir., 1961, 300 F.2d 559; Barnwell Drilling Co., Inc. v. Sun Oil Co., 5 Cir., 1962, 300 F.2d 298; Detroit Football Co. v. Robinson, 5 Cir., 1960, 283 F.2d 657. The Sheriff asks us to agree with him that the trial Judge was wrong. But that is not precisely the issue before us. The granting or denying of a preliminary injunction is within the discretion of the trial Judge, "in the exercise of which the court balances the conveniences of the parties and

4. The injunction ordered that the Sheriff and his Deputies were thereby "restrained and enjoined from: (1) by any means * * * interfering with, preventing or molesting the petitioners from peacefully assembling, peacefully picketing, and peacefully publicizing the dispute between the [Council] * * * and [the Company]." Paragraph (2) in the injunction was similar except that it restrained the Sheriff and his Deputies from interfering with members of the Council in "peacefully assembling, * * * picketing and * * * publicizing disputes of the Council *with other employers* [in] the Parish of Plaquemines, Louisiana, and from visiting and entering the Parish of Plaquemines * * * for the purpose of peaceful assembly, * * * picketing, and * * * publication of disputes of the Council with *employers within* [such Parish]." (Emphasis supplied)

The order then "Provided, that nothing herein contained shall or shall be construed to affect, prevent, prohibit or interfere with the defendants * * * Wooten [and Deputies] * * * from the lawful discharge of the duties of their offices."

possible injuries to them according as they may be affected by the granting or withholding of the injunction." Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, 88 L.Ed. 834. Consequently, we do not review the intrinsic merits of the case as such. Rather, our inquiry is whether there has been an abuse of discretion. Our review of the probable merits does not go to the question of whether we would ultimately hold that the trial Judge was right or wrong, but only to the ascertainment of whether his action was within his broad range of discretion. Of course, like many other factors unnecessary here to itemize, the probable ultimate outcome of the case, or the likely ultimate holding on identifiable, critical legal points will be important matters for evaluation in the inquiry concerning abuse of discretion.

But within even that limited scope several contentions advanced are of such a nature that if they are demonstrated now to be correct to a substantial certainty, there would be no point in a trial on the final merits since no likely trial developments could overcome them.

As the first of such insuperable barriers, it is urged that the District Court had no jurisdiction to hear this case on the ground that the relief prayed for lies exclusively within the jurisdiction of the National Labor Relations Board. But this overlooks several things. The first is that this case is not between an employer and a union. The second is that in this case one of the parties is an agent of the sovereign state. No case has been cited to us, nor have we found one, in which the Labor Board undertook to adjudicate the rights and duties of state peace officers. Cf. § 2, 29 U.S. C.A. § 152(2). More than that, the rights sought to be enforced by this injunction are not those arising under the Labor Management Relations Act or related laws as such. The rights asserted here are those claimed to be secured by the Constitution and for which a legal sanction and jurisdiction is afforded by the Civil Rights Statutes. The Board, with all of its capacity for handling labor disputes, has not been called upon by Congress to look into alleged deprivations of constitutional and civil rights in this situation. Those matters, at least up to now, have been left in the hands of the Courts.

Next, the Norris-LaGuardia Act is said to preclude the present injunction since the purpose of that Act was to confine within a narrow compass the issuance of injunctions in labor disputes by Federal Courts. It is argued more specifically that the requirements of § 7, 29 U.S.C.A. § 107, have not been met. But again, the question whether it was error for the Judge to conclude, as he did, that the proof showed that the requirements of § 7 had been met is not directly before us. As we have stated, this is but one factor in our narrow review of the Judge's broad discretion. Whatever might ultimately be the holding on the adequacy of the evidence on this point, it was certainly sufficient to override any contention that it was an abuse of the Judge's discretion to make this interim conclusion. Insofar as the contention rests upon a question of that law, uninfected by a factual dispute, we think that the Act on its face does not include the type of case before us. The definition section, § 13, 29 U.S.C.A. § 113, speaks in terms that do not appear to match our situation. Broad as it is, § 13(a) says that a case involves or grows out of a labor dispute when the dispute is (a) between employers and employees, or (b) between employees and employees. That is not the nature of this controversy. Section 13(b) defines a "person participating or interested in a labor dispute" as one against whom relief is sought and who is engaged in the same industry in which the dispute occurs. A fair reading of this section would hardly include state peace officers. Section 13(c) defines a "labor dispute" as "any controversy concerning terms or conditions of employment." But the present dispute involves terms and conditions of employment only indirectly and then not between parties to such employment. Rather, this controversy concerns the as-

serted right to picket and the alleged deprivation of that right, not by the employer, or by one under contract to the employer, but by a state officer acting under color of his office.

Failing on these two contentions, it is finally urged that this picketing may not be elevated to a constitutional plane to thereby bring an infringement of such "rights" within the Civil Rights Statutes for the purpose of investing the Court with jurisdiction. This rests on one or both of two subsidiary arguments. The first is that the picketing was actually illegal, that is, in direct violation of applicable federal law. The second is that by a watering down of earlier pronouncements the Supreme Court has now withdrawn from picketing a civil rights constitutional status.

■ As to the first of these, if the picketing was illegal then, so the argument runs, the Sheriff had not only a right but a duty to prohibit it. But at the present stage of the proceedings and on the unavoidably incomplete record of a preliminary injunction neither illegality [5] or a State Sheriff's right to prohibit it are so surely established as to prevent a court from issuing interim relief pending orderly resolution of that or other issues.

The charge of illegality is that this conduct violates, not Louisiana law and policy, but rather the 1959 Landrum-Griffin Act Amendments to the federal law.

■ To be sure the Landrum-Griffin Act put important restraints upon the freedom to picket.[6] The Sheriff points to the second proviso in § 8(b) (7) (C) [7] in a further attempt to show that the picketing was illegal. But the evidence as to whether any trucks did actually refuse to make deliveries was conflicting.[8] And it is not the function of this Court to resolve conflicting evidence in the first instance. That function is exclusively for the trial Judge whose findings carry perhaps a double insulation of F.R.Civ. P. 52(a), 28 U.S.C.A., and the abuse of discretion concept on this interlocutory appeal. At the full hearing on the application for a permanent injunction, complete evidence on that point will undoubtedly be introduced, and it is likely that the Judge presiding will have to make findings as to whether this picket line had the prohibited effect. Consequently, we feel that the legality of the picketing vis-a-vis § 8(b) (7) (C), if pertinent at all, is not ripe for review at this time. Even more tentative is the question whether a State Sheriff is either charged with, or may assume, a responsibility for coercive enforcement of this federal law, or offer this as a defense to asserted denial of civil rights. Certainly on a thing of such importance in the delicate relation between the National

---

5. In a related case growing out of the same circumstances, Lebus, etc. v. Building and Construction Trades Council, E.D.La., 1961, 199 F.Supp. 628, a petition by the Regional Counsel of the Board to enjoin the picketing was denied on the grounds that the picketing did not violate that federal statute.

   A similar question is now pending before the Supreme Court by the grant of a writ of certiorari to the Georgia Supreme Court to review its ruling (217 Ga. 512, 123 S.E.2d 653). Curry v. Construction & General Laborers Local 438, 82 S.Ct. 1159.

6. See, e. g., § 8(b) (7), 29 U.S.C.A. § 158 (b) (7). See also Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.Law Rev. —— (1959).

7. § 8(b) (7) (C). " * * * Provided further, That nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public (including consumers) that an employer does not employ members of, or have a contract with, a labor organization, unless an effect of such picketing is to induce any individual employed by any other person in the course, of his employment, not to pick up, deliver or transport any goods or not to perform any services."

8. Cf. Lebus v. Building and Construction Trades Council, E.D.La., 1961, 199 F. Supp. 628, 629.

and State governments, we should be sure that the question is actually and factually raised before we speak finally.

These considerations are of even greater importance in analyzing the second facet that picketing is no longer to be equated with constitutionally guaranteed free speech.

We start with the fact that this is the reverse of the usual case. In most, the problem has been the nature of the circumstances which would permit a state court injunction against picketing. Here it is a question of permissible court action to secure—not prohibit—the opportunity of picketing.

■ And whether in the usual context, or in this more unusual one, we cannot be unmindful that the protection afforded picketing has changed considerably since the broad pronouncements in Thornhill.[9] Some of the subtle factors which tip the scale one way or the other to prevent or allow state court injunctions against picketing are traced by Mr. Justice Frankfurter's majority opinion in International Brotherhood of Teamsters, etc. v. Vogt, supra, 354 U.S. 284, 289–293, 77 S.Ct. 1166, 1 L.Ed.2d 1347. Rejecting impliedly the insistence of the dissenters that by that decision " * * * the Court signs the formal surrender," 354 U.S. 284, 297, 77 S.Ct. 1166, of Thornhill, the Court now seems to regard it as a " * * balance struck by a State between picketing that involved more than 'publicity' and competing interests of state policy." 354 U.S. 284, 290, 77 S.Ct. 1166.

Here, of course, the Sheriff seeks to justify his non-judicial restraint, not because of Louisiana policy, but rather that of the National Government. But whether this and other factors will, or may, tip the scale for or against picketing as a fundamental right under these circumstances is a matter requiring at least two things. The first is the full opportunity to develop all of the relevant facts. The second is a like opportunity to weigh, digest, evaluate and compare all such facts and the infinite inferences to be drawn to measure them against the ultimate standard which must be synthesized from Thornhill and all which has followed (see note 9, supra,). In stating these requirements, we are, of course, speaking about the trial of the case on its final merits.

■ This highlights once again the distinctive role of the interlocutory appeal. On this sketchy record made up from an unavoidably shortened hearing to determine whether emergency action is to be taken to preserve the existing status, we cannot possibly know whether on the final proof the picketing here will measure up to constitutionally protected free speech. We do know this much however. Tested against these elusive factors, the Judge's conclusion that it was probably protected picketing was not so wholly unsupported as to be what the law calls an abuse of discretion. On the contrary, the circumstances point in the other direction. The Sheriff's effort on the trial and before us to make out a case of prohibiting picketing because of the traffic hazard immediately adjacent to a high speed highway could well have seemed to the trial Judge to be an afterthought. The same is true of the belated

9. Thornhill v. Alabama, 1940, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093.

Some of the Supreme Court cases dealing with the scope of the constitutional protection of picketing are International Brotherhood of Teamsters v. Vogt, Inc., 1957, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed. 2d 1347; Building Service Employers International Union Local 262, v. Gazzam, 1950, 339 U.S. 532, 70 S.Ct. 784, 94 L.Ed. 1045; Giboney v. Empire Storage & Ice Co., 1949, 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834; Bakery & Pastry Drivers and Helpers Local 802, etc. v. Wohl, 1942, 315 U.S. 769, 62 S.Ct. 816, 86 L.Ed. 1178; Carpenters and Joiners Union, etc. v. Ritters Cafe, 1942, 315 U.S. 722, 62 S.Ct. 807, 86 L.Ed. 1143; Milk Wagon Drivers Union, etc. v. Meadowmoore Dairies, 1941, 312 U.S. 287, 61 S.Ct. 552, 85 L.Ed. 836.

For a discussion of the effect of some of these cases, see, Williams, Freedom to Speak—But Only Ineffectively, 38 Tex.L. Rev. 373 (1960).

suggestion made here, but not below, that LSA–R.S. 14:97 makes it a crime to obstruct a highway. These impressions seem especially plausible in view of the fact that the arrests were for disturbing the peace, not for creating traffic hazards or obstructing the highway.

The Court viewed it as a case in which, on the strong showing made, a Sheriff was taking it into his hands to protect open or non-union shops in Plaquemines Parish against either informational or organizational picketing. Nothing said or then done by the Sheriff or his Deputies revealed any other basis for the initial interference and later arrests. It was not directed at the Council merely because of this job at Happy Jack involving this particular Company. The Court pending final hearing was justified in concluding that the action toward this picketing was characteristic of the policy which the Sheriff had established for the whole Parish.[10] We think it might have been preferable not to have granted Paragraph (2) of the order (see note 4, supra) since the Court could easily have granted supplemental relief if new instances cropped up. But since the order in this form has been in force now for some time, and it is evident that the case must be tried without delay on its final merits, we see no purpose in expressly modifying it. It, like Paragraph (1), enjoins only interference with peaceful picketing, assembly, etc. leaving the Sheriff free, as the order states, to discharge the lawful duties of his office. The uncertainty in that situation stems not from the identity of the particular employer sought to be picketed (Par. (1) or (2)). It comes, rather, from the inherent, intrinsic uncertainty of what does or does not constitute civil rights protected picketing. But no order, no matter how precise, can simplify what Supreme Court cases demonstrate is so complex. Of course, this uncertainty is a factor of great importance in determining the nature and kind of relief, if any, to be granted upon the final merits. But this adjustment in the delicate relationship between the two sovereigns emphasizes again that the full facts may well manifest that what seemed to the trial Judge to be required in the emergency atmosphere may well turn out to be something quite different on the final showdown.

Affirmed.

---

10. Paragraph 13 of the verified complaint charged that defendants had threatened to prevent peaceful picketing, etc. throughout the Parish. The Court likewise referred in its findings to a prior similar case in which injunction was issued against these defendants.