Mrs. Fannie Lou **HAMER** et al.,
Appellants,

v.

Cecil C. **CAMPBELL**, Circuit Clerk and Registrar of Sunflower County, Mississippi, et al., Appellees.

No. 22552.

United States Court of Appeals
Fifth Circuit.

March 11, 1966.

Rehearing Denied April 6, 1966.

---

See also 5 Cir., 345 F.2d 787.

Morton Stavis, Newark, N. J., Bruce Waltzer, New Orleans, La., Martin R. Bradley, Jr., Buffalo, N. Y., Arthur Kinoy, New York City, L. H. Rosenthal, Jackson, Miss., for appellants.

Will S. Wells, William Allain, Asst. Attys. Gen., Joe T. Patterson, Atty. Gen., Jackson, Miss., Oscar B. Townsend, Forrest G. Cooper, Indianola, Miss., P. J. Townsend, Jr., Drew, Miss., Alfred A. Levingston, Cleveland, Miss., for appellees.

Before HUTCHESON and BROWN, Circuit Judges, and MORGAN, District Judge.

JOHN R. BROWN, Circuit Judge:

A Negro citizen, because of a pattern and practice of racial discrimination, has been denied the right to register to vote. After she registers pursuant to a Federal Court order, she will be denied the right to vote in a municipal election because she has failed to pay poll taxes for two preceding years and because she has not registered within the time allowed by state law—a deadline two months prior to the Federal Court order permitting her to register. Does she have standing to bring a class action on behalf of Negro voters similarly situated to enjoin the municipal election? We hold she does and reverse the holding of the District Court to the contrary. Could and should the District Court have enjoined the election? We hold that the District Court erred in failing to do so. Finally, under the special circumstances of this case, we remand to the District Court with instructions to set aside the election it should have initially enjoined.

On April 8, 1965, in United States v. Campbell, N.D.Miss., No. GC 633, the Federal District Court found that the Registrar of Sunflower County, Mississippi, for many, many years had deprived Negro citizens of their right to register to vote by means of a pattern and practice of racial discrimination [1] and, pursuant to 42 U.S.C.A. § 1971(e), enjoined these practices and entered a "freeze" order for a period of one year to allow the deprived Negroes a chance to catch up and to participate in the electoral process on the same basis on which white citizens have participated.[2] Within three weeks of the District Court's order 306 Negroes had registered for the first time in Sunflower County.

Unfortunately, their success in registering was illusory. Municipal elections in Sunflower County were scheduled for June 8, 1965, with primaries for these elections to be held on May 11 and 18. Because of two requirements of Mississippi law, these newly registered Negroes could not participate as voters in these elections. First, a municipal elector must have registered in the municipality more than four months prior to the general election in order to vote in the primaries and in the general election. Miss. Code Ann. § 3374–60 (1942 recomp. ed.). In this case the cutoff date was February 8, two months prior to the § 1971(e) Federal Court order facilitating Negro

---

1. The District Court found the following statistics for Sunflower County:

| | Whites | Negroes |
|---|---|---|
| Persons of voting age | 8,785 | 13,524 |
| Persons on current registration books | 7,082 | 155 |
| Percentage registered | 80% | 1.1% |
| Persons on current poll books * | 6,128 | 95 |

\* Those who have paid poll taxes for the two years next preceding the current year and who are on the registration books.

---

2. See, e. g., Louisiana v. United States, 1965, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed. 2d 709; United States v. Ramsey, 5 Cir., 1965, 353 F.2d 650 [No. 22315, Nov. 12, 1965]; United States v. Ward (Louisiana), 5 Cir., 1965, 349 F.2d 795; United States v. Lynd, 5 Cir., 1965, 349 F.2d 785 (appeal); United States v. Ward (Miss.), 5 Cir., 1965, 345 F.2d 857.

registration in the county.[3] Second, poll taxes must be paid for the two years preceding the year in which the offer to vote is made. Miss.Const. § 241; Miss.Code Ann. §§ 3130, 3160 (1942 recomp. ed.).[4] Thus, Negroes, who were given their first opportunity to register by the April 8, § 1971(e) order, would be unable to vote in the forthcoming municipal elections, since it would be impossible for them to meet the four-month registration requirement and highly unlikely for them to be able to meet the poll-tax requirement. Similarly, because of state law, it would be impossible for any of these newly registered Negroes who desired to run for municipal office to qualify as candidates. In order to be a candidate for municipal office, a citizen of a municipality must be a qualified elector (i. e., must meet the four-month registration and poll-tax requirements).[5] Miss.Code Ann. §§ 3374–42–55. Thus, for four years Negroes would be governed by city officials whose election they had no opportunity to participate in, either as voters or candidates.

On April 23 five Negro residents of Sunflower County filed this class action on behalf of all Negro voters and potential candidates of the County. After reciting the above facts, the complaint sought a judgment: (1) delaying the municipal elections and fixing new dates therefor, (2) fixing a new cutoff date for voter registration for the delayed elections, (3) fixing a new cutoff date for qualification of candidates, and (4) suspending the requirement that poll taxes shall be paid as a prerequisite to voting, or, in the alternative, allowing *nunc pro tunc* payment of 1963 and 1964 poll taxes.[6] The plaintiffs also requested a preliminary injunction against the holding of the primary and general elections.

Although plaintiffs sought to enjoin elections in six municipalities [7] in the County, they proceeded at the outset on the theory that they could represent a county-wide class of Negro voters and candidates. We agree with the District Court that under these circumstances there could be no county-wide class for the purpose of enjoining municipal elections throughout the county. We also agree with the District Court that as to four of the municipalities [8] there was clearly no proper plaintiff-representative included in the original complaint. As to the two remaining municipalities, Ruleville and Sunflower, the District Court held that in spite of the fact that two plaintiffs resided therein, "technically, when viewed as a class action, this suit must fail."

3. County registration is a prerequisite to municipal registration in Mississippi. Miss.Code Ann. § 3374–60 (1942 recomp. ed.).

4. The recent changes in Mississippi's voter requirements (e. g., elimination of the good-moral-character, the duties-of-citizenship, and the read-and-interpret tests), referred to in United States v. Ramsey, supra, 353 F.2d 650, at 653 n. 8 [No. 22315, Nov. 12, 1965], did not affect this requirement.

5. Also, the final day for qualifying as a candidate for the May 11 primary elections was March 12.

6. Although it would have been possible merely to fix new cutoff dates for registration, qualification of candidates, and payment of poll taxes prior to the elections as *originally* scheduled, the District Court had ample basis for presumably be-

lieving that the short time between the filing of this suit and the scheduled primaries made this impractical. The Court undoubtedly assumed that for the other relief sought (2–4) to be effective, it would be imperative that the elections be postponed.

7. Sunflower, Moorehead, Ruleville, Drew, Inverness, and Doddsville. At the trial the plaintiffs agreed to a dismissal of the Town of Indianola, since it appeared that under that town's special charter no municipal elections were to be held until November 23, 1965. The District Court held that the Town of Rome was apparently no longer in existence; no defendant from Rome was notified of the hearing, and counsel for the other defendants informed the Court that Rome had surrendered its charter and no longer conducted elections.

8. Moorehead, Drew, Inverness, and Doddsville.

We cannot say the District Court erred in its holding as to the Ruleville resident, Mrs. Hamer. Testifying that she desired to run for mayor, she purported to represent potential Negro candidates for municipal office. The principal obstacle to her effort was that she had become a qualified elector by registering and paying all necessary poll taxes prior to the March 12 cutoff date for filing as a candidate, and the election officials of Ruleville testified that had she so filed, her name would have been put on the ballot. She did not dispute this, but instead explained her failure to file by the assumption that it would be impossible to win with only one percent of her race eligible to participate in the election. See note 1, supra. We believe the District Court was warranted in holding "this court cannot indulge in this assumption." Also, there was no showing that any other Negroes intended to run for municipal office in Ruleville. Thus, there was no class of potential Negro candidates, and even if there were, Mrs. Hamer could not represent it since she could have been a candidate had she chosen to do so. Without a class on the one hand or a proper representative on the other, a class action pursuant to Rule 23(a) must fail. It is elementary that "an individual suing in behalf of the members of a class must be a member of the class which he is supposed to represent." 2 Barron & Holtzoff, Federal Practice and Procedure § 567, at 308 (Wright rev. 1961). See 3 Moore, Federal Practice #23.04 (2d ed. 1964). As to Mrs. Hamer and Ruleville, the District Court correctly held that no class action could be maintained on the basis of the original parties plaintiff.

The Town of Sunflower is a different matter. The District Court erred in its holding as to the Sunflower resident, Mrs. King. The Court found that al-though she did not register until after its § 1971(e) order, she had failed to pay the poll tax for the two preceding years (1963 and 1964), and thus even had there been no discriminatory practice preventing her from registering, she would still be unable to participate in these elections. It is true that there was no evidence of any discrimination in the acceptance of poll taxes, that Mrs. King could have paid, and that theoretically she had an obligation to pay, whether or not she was registered to vote.[9] But we do not believe that her failure to do so should prejudice her right to maintain this class action. Two considerations buttress this belief.

The first is United States v. Dogan, 5 Cir., 1963, 314 F.2d 767, where we considered Mississippi's poll tax requirement and held that since it had been used as an engine of discrimination, its use should be enjoined. We also held the District Court can, in the exercise of its broad equitable powers, allow the payment of overdue poll taxes *nunc pro tunc* if necessary to remedy the past discrimination. Such relief is much akin to the judicial freeze order which we have so often sanctioned in voter registration cases (see note 2, supra) and which, indeed, the District Court used in United States v. Campbell. Both are recognitions of the judicial duty to eradicate for the future the consequences of part discriminations and to assure that the abuses do not continue. Though in *Dogan* we found discrimination in the acceptance of poll taxes among those (white and Negro) seeking to pay them, while there was none here, we would do violence to the *raison d'etre* of doganizing, and freezing, were we to limit this relief to the situation we found there. There we said, "A glance at the constitution and statutes of Mississippi reveals the close tie-in between payment of poll taxes and voting * * *." 314 F.2d at 773.[10] The only

---

9. A poll tax of $2 is payable each year by February 1 of that year by every inhabitant of the State between the ages of twenty-one and sixty. Miss.Const. § 243; Miss.Code Ann. §§ 9751, 9919.5.

10. The District Judge in United States v. Campbell recognized this implicit relationship. In paragraph 34 of his Findings of Fact, after stating the number of citizens registered, he gave the number on the current poll books—those who by

consequence of failure to pay poll taxes is loss of the franchise. We should not blind ourselves to the futility of payment by citizens who could not vote anyway. The plaintiffs here only want "for the Court to see what '[a]ll others can see and understand * * *'" United States v. State of Mississippi, S.D.Miss., 1964, 229 F.Supp. 925, 998 (dissenting opinion), reversed, 1965, 380 U.S. 128, 85 S.Ct. 808, 13 L.Ed.2d 717. The relief we felt proper in *Dogan*—allowing payment of poll taxes *nunc pro tunc*—just happened to be in response to a situation where the poll tax itself was the vehicle of the past discrimination. But in *Dogan* and here that relief is proper *because* the poll tax is an obstacle to correcting the effect of past discrimination, regardless of the means by which it was effected.

The second consideration is the Voting Rights Act of 1965.[11] We have recently held that even though this Act became law subsequent to the decisions below, we must apply it on appeal.[12] After declaring that the poll tax "(i) precludes persons of limited means from voting * *, (ii) does not bear a reasonable relationship to any legitimate State interest in the conduct of elections, and (iii) in some areas has the purpose *or effect* of denying persons the right to vote because of race or color," (emphasis added) Congress directs the Attorney General to in-stitute actions against states or political subdivisions for declaratory judgment or injunctive relief against the enforcement of the poll-tax requirement. § 10 (a), (b). Then the Act provides:

"(d) During the pendency of such actions, and thereafter if the courts * * * should declare the requirement of the payment of a poll tax to be constitutional, no citizen * * * who is a resident of a State * * * with respect to which determinations have been made under subsection 4(b) * * * during the first year he becomes otherwise entitled to vote by reason of registration by State or local officials or listing by an examiner, shall be denied the right to vote for failure to pay a poll tax if he tenders payment of such tax for the current year to an examiner or to the appropriate State or local official at least forty-five days prior to election, whether or not such tender would be timely or adequate under State law. * * *"

In this case we have all the elements necessary to trigger § 10(d): pendency of proceedings by the Attorney General to enjoin Mississippi's poll tax;[13] determinations under § 4(b) with respect to Mississippi;[14] and an offer by these plaintiffs 45 days prior to the general election to pay poll taxes for the two preceding and current years.[15] In the 1965

---

virtue of their payment of the poll tax were eligible to vote. See note 1, supra. Then he said, "The aforementioned discriminatory conduct of the defendant and his agents is a principal cause of the great disparity in the number of persons of each race who are registered *and eligible to vote*." (Emphasis added) The figures themselves reveal the obvious: neither unregistered whites nor unregistered Negroes pay the poll tax, theoretical duties of citizenship notwithstanding.

11. Pub.L.No.89–110, 89th Cong., 1st Sess., 79 Stat. 437, 42 U.S.C.A. § 1973 et seq., approved August 6, 1965.

12. See United States v. Ward (Louisiana), 5 Cir., 1965, 352 F.2d 329, modifying on rehearing 349 F.2d 795; United States v. Ramsey, 5 Cir., 1965, 353 F.2d 650 [No. 2315, Nov. 12, 1965].

13. United States v. Mississippi, S.D.Miss., No. 3791, pending. See also United States v. Texas, W.D.Tex., 1966, 252 F. Supp. 234 [Feb. 9, 1966] (holding Texas poll tax unconstitutional).

14. See 30 Fed.Reg. 9897 (August 7, 1965); United States v. Ramsey, 5 Cir., 1965, 353 F.2d 650 [No. 22315, Nov. 12, 1965].

15. In their complaint filed April 23, 1965, 46 days prior to the general election on June 8, plaintiffs requested that they and all those for whom they sued be allowed to pay *all* overdue poll taxes *nunc pro tunc*. In contrast, § 10(d) of the 1965 Act requires payment of the poll tax for the current year only: "The effect of this provision was to waive payment of poll taxes for the years prior to the one in which the applicant sought to make payment to an examiner." S.Rep.No.162,

Act Congress has clearly recognized what the plaintiffs here ask us to recognize: that regardless of nondiscriminatory use of the poll tax, it often has the "effect of denying persons the right to vote." [16] Congress also recognized that "[t]he fact that there was not more evidence presented * * * on the discriminatory operation of the poll tax may be in part attributable to the widespread discrimination through literacy tests, vouching requirements, economic reprisals and even violence, that has kept most Negroes from every reaching the poll tax stage." [17] And Congress has now provided the remedy which the plaintiffs were denied by the District Court.

■ But without determining that the congressional remedy provided by the 1965 Act is available to these plaintiffs, and regardless of whether the 1965 Act would produce the same result we reach here, we follow a *Dogan* freeze approach in devising suitable equitable measures and, in so doing, we embrace as a part of court-created relief the broad policies adopted by the Congress. And this approach leads to the conclusion that for the purpose of determining the existence of a class of eligible voters and the standing of a named plaintiff to represent that class, the failure to meet the 2-year poll-tax requirement is of no significance in this case. Mrs. King had standing to bring this action on behalf of the Negro residents of the Town of Sunflower.

■ Having so concluded, we now reach the question of whether the District Court should have enjoined the municipal election of the Town of Sunflower. There can be no question that a District Court has the power to enjoin the holding of an election. In State of Alabama v. United States, 5 Cir., 1962, 304 F.2d 583, we emphasized the broad equitable powers of the District Court to mould relief sufficient to wipe out the effects of racial discrimination. And the recent reapportionment cases remove any doubt that these powers encompass the power to enjoin an election.[18] To be sure, the Supreme Court in Reynolds v. Sims, 1964, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506; Roman v. Sincock, 1964, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620; and Davis v. Mann, 1964, 377 U.S. 678, 84 S.Ct. 1441, 12 L.Ed.2d 609, has held that in some cases it might be proper not to enjoin an election to be conducted pursuant to an unconstitutional plan. But appellees' reliance on these cases is misplaced. The shoe will not fit. First, the Court clearly warned that it "would be the *unusual* case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." [19] Second, the reapportionment cases deal with dilution of the vote. This case involves a deprivation. Third, in the reapportionment cases the Court is dealing with a legislative function. Staying judicial relief may give the

89th Cong., 1st Sess. (1965) [U.S.Code Cong. & Ad.News, p. 2566].

16. S.Rep.No.162, 89th Cong., 1st Sess. (1965) [U.S.Code Cong. & Ad.News, p. 2571]: "Since almost all Negroes deprived of their voting rights by those 'tests or devices' that this bill is directed against, * * * have not paid [the poll tax] in previous years, the cumulative provisions of the State laws are in effect. A Negro in Mississippi, therefore, whose income reaches the nonwhite State median would have to pay over 12 percent of 1 week's income in order to vote. * * * For the many rural Negroes who buy on credit and transact most of their business in a bartering fashion, the funds needed for poll tax payments are almost impossible to raise in their noncash economy."

17. H.R.Rep.No.439, 89th Cong., 1st Sess. (1965) [U.S.Code Cong. & Ad.News, p. 2452].

18. For cases where elections have been enjoined, see, e. g., Bush v. Martin, 1963, S.D.Tex., 224 F.Supp. 499, aff'd, 1964, 376 U.S. 222, 84 S.Ct. 709, 11 L.Ed.2d 656; Calkins v. Hare, E.D.Mich., 1964, 228 F.Supp. 824; Ellis v. Mayor and City Council of Baltimore, D.Md., 1964, 234 F.Supp. 945.

19. Reynolds v. Sims, 1964, 377 U.S. 533, 585, 84 S.Ct. 1362, 1393, 12 L.Ed.2d 506, 541.

State a chance to clean its own house and thus avoid a court-imposed, nonlegislative disruption of its election process. In effect, the substantive relief ordained by the court is to come from action by the legislature. Hence a court may properly withhold injunctive relief in order to allow the State to remedy dilution of the franchise. But the municipal bodies involved in these elections have no power to eradicate the deprivation of the franchise. Relief, if it is to be had, must perforce come from the Court or the voters must simply be told to wait four more years. That denial of this fundamental right cannot be justified in the name of equity.[20]

■ Since the District Court should have enjoined the election in the Town of Sunflower, we have concluded that under the special circumstances of this case we must now require that the District Court set it aside. When the appellants appealed the District Court's May 4 denial of a preliminary injunction, they requested an injunction pending appeal. Recognizing its importance, this Court heard the movants orally but denied the motion on May 10 "but without prejudice to the rights of any of the parties upon the hearing on the merits." Appellants then applied for an expedited hearing in hope that this Court could render a decision before the June 8 general elections. Again after hearing the parties on May 20, we denied this application with this significant comment:

> Noting, as we do, that respondents [appellees], in their opposition to said application, state that "if this Court finds that certain constitutional rights belonging to the appellants have been discriminatorily denied, and that the District Court should grant certain specific relief, said relief can be granted at any time in the future and appellants will not be irreparably injured because of

any delay in the granting of said relief," it is apparent that respondents concede the power of the Court to grant appellants full relief in the same manner as if the said election had been enjoined by the District Court, *even to the extent of declaring said election to be void.* Under such circumstances, and in view of the fact that this Court will not hold a regular session during the week of May 31st, or at any time prior to the said election date, and in view of the many serious legal questions involved in the issue now presented on this appeal, the application * * * is denied. [Emphasis added.]

Having concluded that the Sunflower municipal election should have been enjoined, we now must set it aside in order "to grant appellants full relief in the same manner as if the said election had been enjoined."

This action does not mean that we necessarily would set aside every election in which a substantial number of citizens have been denied the right to vote. This is not a case where an election is challenged for the first time after it is held. Here appellants attempted to enjoin the election, and failing where they should have succeeded, they were diligent in seeking to have this failure rectified by our reversal prior to the election. Our absence of facilities to rectify rapidly should not now prevent us according full relief to appellants.

The Sunflower election must be set aside, but what should be done in the cases of the other municipalities[21] from which the District Court properly concluded there were no named plaintiff-representatives? During the May 29 hearing on the preliminary injunction it became obvious that the class action would have to stand on its own as to each municipality and that as to some municipalities there were no proper representatives.

20. In denying the injunction on the merits, the District Court pointed to the fact that the ballots had already been printed. We do not believe that the slight inconvenience to the appellees in reprinting the ballots justified the Court's refusal to enjoin the elections.

21. Ruleville, Moorehead, Drew, Inverness, Doddsville.

Thus, counsel for the plaintiffs requested leave to file an amended complaint adding plaintiffs. The District Court was willing to allow this if counsel would consent to reopen the hearing so that the defendants would have a chance to controvert the standing of such added parties. This caused a dilemma for plaintiffs' counsel: as he explained to the Court, reopening the hearing would delay the decision on the preliminary injunction beyond the scheduled primaries. So counsel understandably consented to termination of the hearing on the preliminary injunction. The preliminary injunction was denied on May 4 and on May 6 notice of this appeal was filed. On May 8 appellants filed a "Second Supplemental Complaint" adding parties-plaintiff [22] and requesting an ex parte temporary restraining order. Noting that there was not enough time before the May 11 primaries for a hearing on this request, the District Court refused to grant it ex parte. This refusal is also on appeal here.

■ Appellees in effect assert that none of the District Court's actions concerning the "Second Supplemental Complaint" are before us. They argue that the May 6 appeal from the May 4 denial of the preliminary injunction divested the District Court of jurisdiction to consider the May 8 supplemental complaint. They cite a number of cases, all of which deal with an appeal from a final judgment.[23] But the denial of the preliminary injunc-

tion on May 4 was not a final judgment, and the appeal filed on May 6 was an interlocutory appeal pursuant to 28 U.S.C. A. § 1292(b) and as such did not divest the District Court of jurisdiction of the supplemental complaint. In United States v. Lynd, 5 Cir., 1963, 321 F.2d 26, 28, we held that " * * * appeal from the denial * * * of a preliminary injunction should not ordinarily delay the final trial of the case on its merits." See Wooten v. Ohler, 5 Cir., 1962, 303 F.2d 759; Janousek v. Doyle, 8 Cir., 1963, 313 F.2d 916; 3A Barron & Holtzoff, Federal Practice and Procedure § 1558 (Rules ed. 1964 Supp.).

Alternatively, appellees also argue that on the merits the District Court was correct in denying the ex parte restraining order since the appellants were given a chance to reopen the preliminary injunction hearing on the matter of additional parties but refused to do so. But we do not reach this question since it is not now a problem of whether error was committed. It is now a question of what is before the trial Court on remand. The "Second Supplemental Complaint" properly pends before the District Court.[24] It is, therefore, a part of the case, which we remand by virtue of our holding that Mrs. King is an adequate class representative as to the Town of Sunflower. Of course, as our opinion reflects, a class must be adequately represented, and to the extent that this is factually at issue, there must be an adjudication of it. Con-

22. Plaintiffs were added from the towns of Sunflower, Moorehead, Ruleville, Drew, and Inverness. The "Second Supplemental Complaint" alleges that these parties "want to propose Candidates for elections," as well as to vote in the elections.

23. Hunter Douglas Corp. v. Lando Prods., 9 Cir., 1956, 235 F.2d 631; In re Federal Facilities Realty Trust, 7 Cir., 1955, 227 F.2d 651; Brasier v. United States, 10 Cir., 1955, 229 F.2d 176; Jordan v. Federal Farm Mortgage Corp., 8 Cir., 1945, 152 F.2d 642.

24. Subsequent to the District Court's denial of the relief requested in this complaint and plaintiffs' appeal of this denial,

hence not reflected in the record before this Court, the plaintiffs filed a "Third Supplemental and Amended Complaint" with the District Court on May 14, 1965, after the primary elections of May 11 had been held. This third complaint, without adding new parties plaintiff, requests that the primaries be set aside. The District Court refused to hold a hearing on this complaint on the ground that it lacked jurisdiction pending the appeal of its prior orders to this Court. Though superfluous now in light of our present holding that the elections must be set aside in municipalities from which there is a proper representative, this third complaint also pends before the District Court.

sequently on the remand of this case to the District Court, it will have to determine, in accordance with this opinion, the standing of the plaintiffs added by the "Second Supplemental Complaint." If the Court finds that there are named plaintiffs who properly represent the Negro voters of any or all of the other municipalities (see note 22, supra) of the county, it should set aside the elections in such municipalities just as it must set aside the election in the Town of Sunflower. Again we emphasize that this is not a case where parties are being added after an election is held for the purpose of setting aside that election. Here, for the purpose of enjoining them, parties were seriously added prior to the time of holding the elections.[25]

In setting aside the election of the Town of Sunflower and the elections of any other towns which the District Court on remand finds to be represented by a proper plaintiff, the District Court has wide discretion to devise a plan for new elections.[26] But in some appropriate fashion the plan will have to (1) schedule new primaries and general elections, (2) set a new cutoff date for registration, and (3) set new cutoff dates for filing as candidates for the primaries. For the reasons stated herein, any person registered and otherwise entitled to vote in these new elections shall not be denied the right to vote for failure to pay poll taxes if he tenders payment of such tax for the two preceding years (two years in all) to the appropriate State or local official at least 45 days prior to the election, whether or not such tender would be timely or adequate under State law.

Reversed in part, affirmed in part, and remanded.

HUTCHESON, Circuit Judge.
I concur in the result.

plaintiff who purports to represent the residents of Doddsville.

25. Though the plaintiffs named in the original complaint sought to represent residents of the Town of Doddsville, note 7, supra, the trial Judge correctly determined that there was no representation of these residents. And, perhaps inadvertently, none of the plaintiffs added by the "Second Supplemental Complaint" was alleged to reside in Doddsville. See note 22, supra. But since the elections for that town were challenged, even though imperfectly, prior to the election, we think in light of what we have said, the District Court on remand has considerable discretion in determining whether to allow any effort at such time to add a

26. In seeking the injunction, the plaintiffs conceded that the incumbent municipal officials be allowed to remain in office until the rescheduled elections were held. Likewise, in now seeking to have the elections set aside, they recognize that the winners of the invalid elections held in June 1965 should be allowed to hold their positions until new elections are held. Here also the District Court has ample discretion on remand to devise a plan which will cause the least disruption of municipal government.