UNITED STATES of America

v.

Joseph Walton CRAWFORD, Registrar of Voters of Red River Parish, Louisiana,

and

The State of Louisiana.

Civ. A. No. 9335.

United States District Court
W. D. Louisiana,
Shreveport Division.

May 25, 1964.

Robert F. Kennedy, Atty. Gen., of the United States. Burke Marshall, Asst. Atty. Gen., John Doar, David Norman, Frank Dunbaugh, and Alexander Ross, Attys., United States Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty., for the Western District of Louisiana, Shreveport, La., for the Government.

Jack P. F. Gremillion, Atty. Gen., of Louisiana, Baton Rouge, La., Harry J. Kron, Jr., Asst. Atty. Gen., of Louisiana, Baton Rouge, La., George T. Anderson, Dist. Atty., Red River Parish, Coushatta, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

### FINDINGS OF FACT

1. This suit was filed on February 18, 1963, by the Attorney General of the United States under the Civil Rights Act of 1957, as amended (42 U.S.C. § 1971). The complaint charged the defendants with acts and practices which have deprived citizens of the United States of the right to register to vote in Red River Parish, Louisiana, without distinction of race or color.

2. The defendants in this case are Joseph Walton Crawford, Registrar of Voters of Red River Parish, and the State of Louisiana. Mr. Crawford has been the Registrar of Voters in Red

River Parish since 1948. As Registrar of Voters his function is to receive applications for registration from prospective electors and to determine whether or not they are qualified to register to vote. Mr. Crawford maintains his office at Coushatta, Louisiana, in Red River Parish, and also resides in Red River Parish.

3. In 1960, there were 3,284 white persons and 2,181 Negroes of voting age in Red River Parish.

4. In October 1956, the local Citizens Council challenged the registration status of 1,146 of the 1,362 Negro voters and 27 of the 3,585 white voters. The challenges were based on alleged errors and omissions on the application cards of the challenged voters. These alleged deficiencies were not deficiencies under the standards applied by the Registrar at the time these voters registered and the application cards of many of the white voters who were not challenged contained similar deficiencies. The Registrar thereafter sent out citations to the challenged voters and removed their names from the voter rolls of Red River Parish. The many Negroes and few whites who were thus purged from the voting rolls had to re-register in order to vote in the 1956 Presidential election. When they attempted to re-register, they were required to interpret three constitutional clauses which were printed on test cards. At least 35 Negroes were rejected when they attempted to re-register after the purge and before January 1, 1957.

5. Beginning on January 1, 1957, all voters in Red River Parish had to re-register. By December 31, 1960, there were 2,994 white persons and only 30 Negroes registered to vote in the Parish.

6. In 1961, the permanent registration system, as distinguished from the periodic system of four years, was adopted so that all persons who had been registered since January 1, 1957, were placed on the permanent registration rolls. By June 30, 1963, just prior to the trial of this case, there were 3,132 white persons and 36 Negroes registered to vote. As of November 7, 1963, there were 3,486 white persons and 69 Negroes permanently registered to vote in Red River Parish.

7. Between January 1, 1957, and June 25, 1963, the defendants used the application form as a device to discriminate against Negro applicants for registration to vote in Red River Parish. During that period, 99% of all white applicants for registration were accepted and over 70% of all Negro applicants were rejected.

(a) The defendants scrutinized the applications of Negroes, almost alone. The registration records of Red River Parish contain 49 rejected applications of Negroes. Each of these applications has red check marks put on them by the Registrar to indicate "errors." Many of the "errors" checked on Negroes' applications are of a highly technical nature and do not reflect adversely upon the applicants' qualifications as voters.

(b) The defendants have not so scrutinized the applications of white persons and, in fact, have ignored the "errors" on them. There are no red check marks on any of the 8 rejected applications of white persons nor on any of the 3,251 accepted applications of white persons, although 1,112 (or 35%) of them contain the same or similar "errors" which were checked on the applications of Negroes as the basis for rejection. Five of the 8 rejected applications of white persons indicate that they were based upon insufficient residence.

(c) All of the rejected applications have not been preserved by the Registrar. The registration records contain 49 rejected application forms of Negroes and 8 rejected application forms of white persons. Negroes have been rejected for registration an additional 39 times for which no record has been maintained. There is no evidence of white persons being rejected on any occasion other than those for which the record has been preserved.

8. The defendants' practice of rejecting Negroes, but not white persons, for "errors" on their registration forms continued up to the time of trial of this case.

(a) Between September 6, 1962, and June 25, 1963, the defendants have denied registration to 9 of 15 Negro applicants. Three failed the "citizenship" test and the remaining 6 were rejected for "errors" on their registration forms, including the Form 11 (citizenship test answer card).

(b) During this period, 112 of 113 applications of white persons were accepted even though 73 of these accepted registration forms contained "errors" of the type checked on Negroes' rejected forms.

(c) During this period, Negro applicants were rejected for "errors" in copying the Preamble to the Constitution. Eight white persons registered although altogether they omitted copying the Preamble.

9. The Registrar used different standards in determining the qualifications of applicants with more stringent requirements for Negroes than for whites.

(a) The Registrar sometimes pointed out "errors" and omissions to applicants and permitted them to correct their forms. At other times he did not permit corrections, but simply rejected the application.

(b) The Registrar could not explain satisfactorily how he decides whether to point out "errors" to the applicant or to reject the application.

(c) The Registrar has refused to tell rejected Negro applicants what errors they made and has not permitted them to correct their forms. With few exceptions, Negroes consistently have been rejected for "errors" on their registration forms.

(d) Of the 3,294 white persons of voting age, 3,243 have been registered and only one has been rejected for "errors" on his registration form. This one rejection occurred just a week prior to trial.

10. September 6, 1962, the Registrar commenced using the "citizenship" test and the Preamble test. As of August 31, 1962, there were 3,047 white persons and only 30 Negroes registered to vote in Red River Parish. Thus, 93% of the adult white population and less than 2% of the adult Negro population were permanently registered when the new test went into effect.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this Action under 42 U.S.C. § 1971(d) and under 28 U.S.C. § 1345.

2. The Attorney General is authorized to institute this action on behalf of the United States under 42 U.S.C. § 1971(c) to obtain preventive relief against acts and practices by the defendants which would deprive other persons of rights and privileges secured by 42 U.S.C. § 1971(a).

3. The State of Louisiana is properly joined as a party defendant pursuant to Section 601(b) of the Civil Rights Act of 1960, 42 U.S.C. § 1971(c).

4. Acts and practices of the Registrar which violate 42 U.S.C. § 1971(a) are also the acts and practices of the State. Civil Rights Act of 1960, Sec. 601(b).

5. 42 U.S.C. § 1971(a) forbids any distinctions in the voting process, including registration for voting, based upon race or color.

6. The fact that the Registrar has over a seven-year period rejected 70% of the applications of Negroes and has accepted 99% of the applications of white persons creates a presumption that Negro citizens have been deprived of the right to vote without distinction of race or color; and in the absence of proof by defendants that the rejected Negroes were not qualified under the standards and requirements applied to the accepted white persons, discrimination must be found.

7. The practice of denying registration to Negro applicants on account

of errors or omissions in their application forms while registering white applicants who have made similar errors or omissions on their applications is in violation of 42 U.S.C. § 1971(a) and the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

8. The practice of denying registration to Negro applicants on account of errors or omissions in their application forms, while registering white applicants who have been aided and assisted by the Registrar in filling out their application forms, is in violation of 42 U.S.C. § 1971 (a) and the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

9. The practice of using the interpretation test or any other test as a device to discriminate against Negroes is in violation of 42 U.S.C. § 1971(a) and the Fourteenth and Fifteenth Amendments to the Constitution of the United States.

10. The Registrar's practice of discouraging Negroes, but not white persons, from attempting to register to vote, in the course of registration, is in violation of 42 U.S.C. § 1971(a) and the Fourteenth and Fifteenth Amendments to the Constitution of the United States. From the evidence adduced it is reasonable to infer that other Negroes otherwise qualified to vote were discouraged from attempting to register by the discriminatory acts of the Registrar.

11. In brief, plaintiff advanced the "freezing" theory. Its contention is that it is a violation of 42 U.S.C. § 1971 (a) and the Fourteenth and Fifteenth Amendments to the Constitution of the United States to impose the new "citizenship" test as a prerequisite to registration, at a time when a majority of adult white persons were permanently registered and would not be subjected to the new requirement and due to prior acts of discrimination only a relatively small per-

centage of adult Negroes were registered. The relief sought is an injunction prohibiting the use of the citizenship test or the meeting of any other requirements not previously required of whites in Red River Parish. Such relief would in effect "freeze" the unlawful practices of the Registrar into permanent policy.

Plaintiff is not entitled to such relief.* Former Chief Judge Rives, of the Fifth Circuit, very aptly stated in United States v. Atkins, 323 F.2d 733, 744–745:

"* * * But since the use of this principle necessarily prevents the state from passing otherwise valid regulations, it should be invoked only where there is a great need for it. To apply the freezing idea too freely would mean that no state which has discriminated against Negro voting rights in the past could ever tighten its qualifications the least bit. *Moreover, when the application of this principle would mean that the Board must in the future continue to violate state law as did its predecessors,* the principle should be used, assuming such use could ever be justified, *only if there were no other alternative by which justice could be reached.* * * * [Emphasis added.]

"* * * Rather than making such unlawful practices a permanent fixture in Dallas County, the district court could, on petition by appellant, purge from the registration list those persons proved by the appellant to have been registered by a procedure which does not meet the minimal requirements of State law. These persons could then reapply for registration subject to the same requirements as everyone else."

12. In Red River Parish the Registrar must process applications for registration by Negroes in the same manner that applications of all other voters are processed. A Registrar cannot con-

---

\* Contra, United States of America v. Louisiana, et als., 225 F.Supp. 353 (Three-judge Court, one dissent, E.D.La.), wherein an injunction was issued against use of the "citizenship" test, incuding the Registrar here. This case now is on appeal to the Supreme Court.

stitutionally use the voter application form in any manner which will impose a heavier burden upon Negro applicants than upon white applicants.[1]

DECREE

Pursuant to the Findings of Fact and Conclusion of Law entered this date:

1. This Court finds that the defendants have engaged in acts and practices which have deprived Negro citizens in Red River Parish, Louisiana, of the right secured by the Fifteenth Amendment and by 42 U.S.C. § 1971(a), and that the deprivations of such rights have been pursuant to a pattern and practice of racial discrimination.

2. It is ORDERED, ADJUDGED and DECREED that the defendant State of Louisiana and the defendant Joseph Walton Crawford, Registrar of Voters of Red River Parish, Louisiana, their agents, officers, employees, successors in office and all persons in active concert with them be and each hereby is enjoined from engaging in any act or practice which involves or results in distinctions of race or color in the registration of voters in Red River Parish, Louisiana. Specifically, each of said defendants and persons is enjoined from:

(a) Applying different and more stringent registration qualifications, requirements, procedures and standards to Negro applicants for registration than those which are applied to white applicants in determining whether or not such applicants are qualified to register to vote in Red River Parish, Louisiana.

(b) Using the application form (L.R.–1) in any manner or for any purpose different from and more stringent than that for which it is used in registering white persons in Red River Parish.

3. Applicants who possess the qualifications established by Louisiana law must be registered, and it is the duty of the Registrar to determine whether the applicants possess these qualifications.

4. It is further ORDERED that the defendant Registrar shall notify each rejected applicant for registration of the specific reason for his rejection.

5. It is further ORDERED that the defendant Registrar submit to the Clerk of this Court in writing and a copy thereof to the plaintiff on or before the tenth day of each month after the date of this Decree and until further order of this Court, a report as to his progress in receiving and processing applications for registration during the preceding calendar month. The report shall include:

(a) The dates and places applications were received during the preceding report period and the hours during which the registrar was available to receive applications.

(b) The action taken by the Registrar on applications for registration during the preceding report period which with respect to accepted applications will state the name and race of the applicant, and date of application and with respect to rejected applications, the name and race of the rejected applicant, date of application, and the specific reason for his rejection.

6. It is further ORDERED that defendant Registrar make available at the office of the registrar all registration records of Red River Parish, Louisiana, for inspection and photographing by agents of the United States at any and all reasonable times.

The costs incurred in this proceeding to date are hereby taxed against the defendant Crawford, in his official capacity as Registrar.

---

1. United States of America v. Duke, Circuit Court Clerk and Registrar, Panola County, Mississippi, et al., 5 Cir., 1964, 332 F.2d 759.