**UNITED STATES of America by Ramsey CLARK, Attorney General, Plaintiff,**

v.

**The DEMOCRATIC EXECUTIVE COMMITTEE OF BARBOUR COUNTY, ALABAMA et al., Defendants.**

Civ. A. No. 2685-N.

United States District Court
M. D. Alabama, N. D.
July 24, 1968.

Ramsey Clark, Atty. Gen., Stephen J. Pollak, Asst. Atty. Gen., Frank M. Dunbaugh and Lester N. Scall, Attys., U. S. Department of Justice, Washington, D. C., and Ben Hardeman, U. S. Atty., Montgomery, Ala., for plaintiff.

Preston Clayton, Eufaula, Ala., for defendants.

## ORDER

FRANK M. JOHNSON, Jr., Chief Judge.

In this case the United States challenges the lawfulness of a voting procedure enacted by the Democratic Executive Committee (hereinafter the "Committee") for the election of members to that Committee. The procedure was adopted by Committee Resolution [1] February 17, 1968. The United States alleges that this resolution was adopted with the purpose and effect of diminishing the effectiveness of the Negroes' vote in contravention of the Fifteenth Amendment and 42 U.S.C. § 1971(a).[2]

1. "RESOLVED by the Democratic Executive Committee of Barbour County, Alabama, that from and after the May, 1968 Primary Election this Committee shall consist of 21 members to be elected from the County at-large; Places on the Committee shall be designated by numbers from 1 through 21; Candidates for membership on the Committee shall when qualifying state which place each is running for; in the event that more than two candidates shall qualify for the same place on the Committee and none shall receive a majority of the votes polled in the first primary election, the names of the two candidates receiving the highest numbers of votes in the first primary election for that place shall be placed on the ballot for the second primary election and the one receiving a majority of the votes polled for that office shall be elected.

"Members shall hold office for 4 years and until their successors shall have been elected and qualified.

"After the May, 1968, Primary Election members of the Committee shall be elected every 4 years."

2. § 1971(a) in pertinent part provides:

"(1) All citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any

Jurisdiction is conferred upon this Court by 42 U.S.C. §§ 1971 and 1973, and by 28 U.S.C. § 1345.

The election of members to the Committee pursuant to the challenged procedure was scheduled to take place at the regular party primary May 7, 1968. On the basis of the complaint and an attached affidavit filed by the United States May 2, 1968, this Court issued a formal Order to Show Cause on May 3, 1968, which enjoined the defendants from certifying the election of any individual to the Committee or from permitting any candidate then seeking membership on the Committee to assume office.

In addition to a continuation of the above relief, the United States seeks an order which would require defendants to submit a plan to this Court which would provide a nondiscriminatory method of electing members to the Committee; to conduct a new election for committeemen in accordance with that plan; and to publicize fully the changes in procedure.

This case is a sequel to Smith v. Paris, 257 F.Supp. 901 (M.D.Ala.1966), aff'd 5 Cir., 386 F.2d 979 (1967), in which this Court struck down as racially motivated a similar procedure adopted by the Committee. A stipulation by the parties reported in that case provides the common factual background:

"For over thirty years, until March 17, 1966, elections of the Barbour County Democratic Executive Committee were held on a combined at-large and beat basis. Five of the twenty-one members of the committee were elected at large. The county was divided into 16 beats and the voters in each beat elected a person residing in that beat to the committee. Prior to March 1966, no Negro had ever qualified to run as a member of the committee. Moreover, prior to the passage of the 1965 Voting Rights Act, a

minuscule number of eligible Negroes were actually registered to vote. This has all changed since the passage of the Act, with the result that in four of the beats in Barbour County, there is a majority of Negroes over white qualified electors. However, over the entire county, there is still a majority of white voters.

"By March 1, 1966, the six plaintiffs had qualified as candidates for the Executive Committee. Four of the six were candidates in beats where the majority of registered voters were Negroes.

"On March 17, 1966, the Barbour County Executive Committee by resolution changed the method of electing committee members so that the 16 members previously elected by beats (or districts) were elected on an at-large basis, although each candidate is required to reside within a particular beat and, after election, represent the beat in which he resides.

"The tabulation of the election returns reflects that if the election had been held under the system that had previously been in force before the resolution of March 17, 1966, three of the plaintiffs would very likely have been elected. Under the county-wide vote system established by this resolution, all plaintiffs were defeated by substantial majorities." Smith v. Paris, supra at 903. (Footnote omitted.)

Against that background and "where the manifest consequences and clear effect of the resolution greatly diminish the effectiveness of the Negroes' right to vote," this Court concluded that "an inference of a discriminatory purpose is compelling." Smith v. Paris, supra at 904.

The legal background is equally clear. It is a fundamental, familiar, and frequently relied upon principle that public actions designed to discriminate

State or Territory, or by or under its authority, to the contrary notwithstanding."

The word "vote" as used in that subsection includes all action necessary to make a vote effective.

against one race cannot be abided. That is the law under the Fourteenth Amendment. Griffin v. County School Board of Prince Edward County, 377 U.S. 218, 231, 84 S.Ct. 1226, 12 L.Ed.2d 256 (1964); Alabama State Teachers Ass'n. v. Lowndes County Board of Education, M.D.Ala., 289 F.Supp. 300, June 17, 1968. And, if more be thought necessary, the principle applies with special force to voting rights under the Fifteenth Amendment. Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); Terry v. Adams, 345 U.S. 461, 463, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Sims v. Baggett, 247 F. Supp. 96, 109 (M.D.Ala.1965).

An unrestricted and meaningful exercise of the franchise has been given special protection by the Supreme Court in accordance with the compelling principle articulated in Reynolds v. Sims, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964):

> "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 377 U.S. at 555, 84 S.Ct. at 1378.

Congress, too, has consistently responded to demands for racial justice with efforts to protect the franchise. The Civil Rights Acts of 1957, 1960 and 1964 all included amendments designed to strengthen 42 U.S.C. § 1971. Not satisfied with the response to those moderate efforts, Congress adopted a more comprehensive protective scheme in 42 U.S.C. § 1973, the Voting Rights Act of 1965.[3] In all these Acts, Congress has supported and attempted to facilitate judicial enforcement of the Fourteenth and Fifteenth Amendments.

■ This legal context and the stipulated facts in Smith v. Paris provide the essential background for this case. This case is significantly different from Smith v. Paris in only one particular: under the 1968 resolution all 21 of the Committee members are to be elected from and are to represent the entire county *without regard to residence.* The chief issue here is whether that difference justifies a different result. On the basis of the pleadings, the testimony of numerous witnesses and accompanying exhibits, and the briefs submitted in this cause, this Court again concludes that the Resolution of the Democratic Executive Committee is a purposeful discrimination against Negroes in violation of the Fourteenth and Fifteenth Amendments.

The method of analysis now used is similar to that used in Smith v. Paris. Plaintiff's proof has been examined to determine whether it justifies an inference of racial motivation. When plaintiff met its burden, the burden shifted to defendants to produce evidence justifying the official action in terms of a permissible public purpose.

Any determination of legislative purpose or motive

> "must be viewed in the context or setting which gave rise to its enactment. Certainly a major element in the circumstances surrounding the promulgation of the resolution presently under consideration, which this Court must take into account, is 'the long history of racial discrimination in Alabama.' Sims v. Baggett, 247 F.Supp. 96 (M.D.Ala.1965)." Smith v. Paris, supra at 904.

Since so little has changed since this Court found that an inference of racial motivation was justified, defendants do

---

3. The United States contends that the procedure involved here is within the terms of Section 5 of that Act (§ 1973c) and that no election pursuant to such procedure should be permitted until the requirements of that section are met. This Court does not reach that question since this case involves a clear violation of the Constitution, entitling plaintiff to full and prompt judicial relief.

not seem to contest seriously plaintiff's contention that the initial inference is again compelling. In drawing that inference this Court notes the similarity between the resolutions, both on their face and on their likely effect on Negro candidates, and that this resolution, like its predecessor, is a substantial departure from the pre-1966 beat system under which certain beats would have Negro majorities. This Court also notes that it is clear that the 1968 resolution was passed with little or no debate, with little view toward alternatives, and with little consideration of this Court's 1966 admonition that the new procedures enacted must not contravene the Constitution and the laws of the United States.

■ Defendants attempt to meet the production burden placed on them to justify the procedure by maintaining that the reason for its adoption was to comply with the principle of fair representation underlying the reapportionment decisions.[4] In 1966 that justification was rejected as a sham. One reason for the rejection was that candidates continued to represent beats or districts whose population disparities remained unchanged. The 1968 resolution formally alters that situation; members now represent the entire country. This Court has doubts whether that change would be sufficient in the best of circumstances. In the present context, such attempted justification is again rejected.

Unlike 1966, this Court now has the benefit of the minutes of the meeting at which the resolution was adopted. There is nothing in those minutes to suggest the Committee had a serious interest in reapportionment. Nor had it been discussed at previous meetings: this was the first meeting since the decision of this Court in August, 1966. The resolution as adopted was submitted in written form by the Committee's attorney. Few members, if any, had seen the resolution prior to the meeting. The attorney told the meeting orally that there was an alternative to this at-large system, viz., redistricting, but he did not present that alternative in written form. It should also be noted that the Committee apparently did not issue a press release or otherwise publicize to the community at large or to Democratic Party members that a significant reapportionment had taken place. The community was largely unaware of any significant change. An analysis of the uncertified results of the May 7, 1968, election reveals that the resolution, in fact, did little to cure the asserted malapportionment. Thus, the reapportionment justification is rejected because, as this Court concluded in Smith v. Paris:

"the only real change wrought by this resolution was to perpetuate the old system of population disparity with the anomalous twist that predominantly Negro beats now have their representatives determined for them by the predominantly white majority of voters in the county as a whole." 257 F. Supp. at 905.

■ In Smith v. Paris the plaintiffs' request that the election be set aside and a new one ordered was denied because of their undue delay in bringing suit. Here the United States has been diligent. Since the defendants have already been given one opportunity to correct what was clearly unconstitutional, this Court now concludes that the special cir-

---

4. Defendants concede that they are not required to reapportion according to the one-man, one-vote standard of the Fourteenth Amendment, which has been extended only to units of local government having general governmental powers over the entire geographic area served by the body. Avery v. Midland County, 390 U.S. 474, 88 S.Ct. 1114, 20 L.Ed.2d 45 (1968). Even if that standard were required, it would not permit a public body to adopt it in a manner that *purposely* discriminated by race, especially where alternative means of complying with the standard were available. Of course, this Court in no way wishes to discourage reapportionment that is not constitutionally required, if it is undertaken for proper reasons.

948

cumstances requiring an order setting aside the May 7, 1968, election exist in this case. Hamer v. Campbell, 358 F.2d 215, 217 (5th Cir.1966).

An order will be entered accordingly.