Albert C. **TONEY** et al., Plaintiffs-Appellees,

v.

N. A. **WHITE** et al., Defendants-Appellants.

**UNITED STATES** of America, Plaintiff-Appellee,

v.

Myrtis **BISHOP** et al., Defendants-Appellants.

No. 72–3307.

United States Court of Appeals, Fifth Circuit.

March 19, 1973.

Rehearing Granted June 1, 1973.

---

John T. Seale, Asst. Dist. Atty., Tallulah, La., for defendants-appellants.

William J. Guste, Jr., Atty. Gen. of La., Baton Rouge, La., George Strichler, New Orleans, La., Donald E. Walter, U. S. Atty., Shreveport, La., M. Karl Shurtliff, Gerald W. Jones, Attys., Dept. of Justice, Washington, D. C., Thomas Clark, Dist. Atty., St. Joseph, La., for plaintiffs-appellees.

Before ALDRICH,* SIMPSON and CLARK, Circuit Judges.

CLARK, Circuit Judge:

On April 4, 1970, a Democratic primary for Mayor, Village Marshall, Board of Aldermen, and Democratic Executive Committee was conducted in Tallulah, Louisiana. Black candidates opposed whites for each of the positions. With the exception of Town Marshall and one of the three positions on the Democratic Executive Committee, white candidates won by margins ranging from 24 to 140 votes. On May 4, 1970, the defeated black candidates and their supporters filed suit against the incumbent Democratic Executive Committee to set aside the results of the April 4 primary for the offices of Mayor, Board of Aldermen, and all Democratic Executive Committee posts on the ground that the rights of the plaintiffs and of all black voters in the municipality secured by the Fifteenth Amendment and the Voting Rights Acts had been violated by a selective and racially discriminatory purge of the roll of registered voters immediately prior to the primary. The United States subsequently filed a similar action against Myrtis Bishop, the parish registrar of voters, which was consolidated with the former case for trial.

The district court found that the acts and omissions of the registrar constituted a violation of the Fifteenth Amendment and the Voting Rights Acts, enjoined the defendants from engaging in further discriminatory practices, voided the primary election results, and ordered that a new primary election be held. Toney v. White, 348 F.Supp. 188, 195–196 (W.D.La.1972). We affirm as to the prospective injunctive relief but reverse that portion of the judgment which voided the election and ordered the primary races to be rerun.

THE FACTS

For over a decade Madison Parish, Louisiana, and particularly the Village of Tallulah, the parish seat, have been the center of intense voter rights activity.[1] On three previous occasions the United States District Court has enjoined parish election officials from engaging in discriminatory conduct against Negro voters. In United States v. Ward, 222 F.Supp. 617 (W.D.La.1963) rev'd on other grounds, 349 F.2d 795 (5th Cir.) modified on rehearing, 352 F.2d 329 (5th Cir. 1965), the court permanently enjoined parish officials from discriminatory practices in regard to voter registration. In Brown v. Post, 279 F.Supp. 60 (W.D.La.1968), the court found racial discrimination in the distribution of absentee ballots for a school board election. In United States v. Post, 297 F.Supp. 46 (W.D.La.1969), the court held that erroneous instructions on voting machines had the effect of denying Negro voters an effective ballot in a special election for Town Marshall. In the latter two cases, as in the present action, the district court required new elections to be held. Neither of these decisions was appealed.

The present case involves an allegedly selective and discriminatory purge of registered voters from the parish voting rolls in the month preceding the 1970 Democratic primary. The facts as found by the district court are as follows:

(1) *The purge of 4-year non-voters.* On March 5, 1970, the date on which the voting rolls were closed to further registration prior to the April 4 Democratic primary, the registrar published in a local newspaper a list of 141 voters from the parish whose names were to be removed from the rolls for failure to vote in any election during the preceding four years.[2] This notice was defective

---

* Hon. Bailey, Aldrich, Senior Circuit Judge of the First Circuit, sitting by designation.

1. See Note, Voting Rights: A Case Study of Madison Parish, Louisiana, 38 U.Chi. L.Rev. 726 (1971).

2. Under Louisiana law it is the mandatory duty of the parish registrar to conduct prior to October 1 of each year a purge of 4-year non-voters. La.Rev.Stat. § 18:240(1). Section 18:240 does not fix a date upon which the registrar is to

under Louisiana law because it failed to state that those listed had the right to appear at the registrar's office within three days of the second newspaper publication to prove their right to remain registered.[3] The 141 voter total on the purge list was comprised of 130 Negroes and 11 whites. Of those eventually removed from the voting rolls, a total of 68 were registered Democrats living in the Village of Tallulah and thus eligible to vote in the April 4 primary. Among those 68 Democrats, 63 were Negroes and 5 were whites.[4] In March 1970, 31 additional persons, 18 blacks and 13 whites, were listed on the voting rolls of Madison Parish who had not voted in the prior four year period, but were not included in the list published by Registrar Bishop on March 5.

(2) *The purge for unreported change of address*: In March 1970 Registrar Bishop also notified 29 Negro voters that their right to remain registered was challenged for failure to report that they had changed their address.[5] Of this group, 24 appeared at the registrar's office and were reinstated on the voting rolls, but 12 of this number were removed from the Tallulah municipal registration rolls and placed on the general Madison Parish rolls.[6] After other adjustments, the district court found that 19 black voters originally registered as Democrats in the Village of Tallulah were removed from the rolls within a month prior to the primary.

During this period the Registrar did not challenge any white voters for unreported change of address. At trial plaintiffs produced a list of 141 white registrants who they asserted should have been challenged for failure to report changes of address. Of these unchallenged whites, 72 voted in the April 4 primary. After the primary contest, the Registrar challenged 75 white voters from this list of 141 at the request of black political leaders and 72 of those challenged were removed from the municipal voting rolls.

(3) *Failure to challenge absentee voters*: La.Rev.Stat. § 18:1080 requires parish registrars to canvass voter rolls for persons who have only voted by absentee ballot for the previous two-year period and require each such voter to substantiate his right to continue to vote in the locality.[7] Although the statute anticipates that challenges under §

begin such a purge. In the opinion of the Louisiana Attorney General, a purge conducted within the 30 days prior to an election, during which the voter books are closed for reregistration, is not within "the spirit of the law." But if a purge is conducted within this pre-election period, registrants who appear before the registrar and validate their registration must be allowed to vote in the impending election. Op.La.Atty.Gen., 1956–58, pp. 209–11.

3. Mrs. Bishop also sent notice by mail to these 141 voters. Each letter informed the registrant that he could appear to show cause why his name should not be removed from the roll. The district court ruled that this information in the notice by mail was insufficient to correct the deficiency in the newspaper publication, because Louisiana law, La.Rev.Stat. § 18:240(2), requires both mail and published notice to be complete and correct.

4. Among the 63 Negroes purged without proper notice, only two were shown to

have appeared at the polls on Democratic primary day and both were allowed to vote.

5. La.Rev.Stat. § 18:131. Notice to these voters failed to strictly comply with the procedure required by Louisiana law, La. Rev.Stat. § 18:132, for the removal of voters for illegal or fraudulent registration.

6. Removal of residence from a municipality results in immediate loss of the right to vote for municipal officers. Op. La.Atty.Gen.1948–50, p. 159; 1946–48, p. 223; 1942–44, p. 422; 1942–44, p. 423; 1942–44, p. 421; 1936–38, p. 293; 1936–48, p. 198.

7. The Louisiana Constitution, Article 8, § 11, provides that certain persons may be absent from their domicile without losing their voting residence, e. g., voters serving in the Armed Forces, seamen engaged in navigation, and students attending an institute of learning distant from their home parish.

18:1080 are to be conducted simultaneously with challenges under § 18:240 and § 18:131, Mrs. Bishop did not challenge any voter to explain continual absentee voting. The parish voting records contained 62 Tallulah registrants, 61 whites and 1 oriental, who had voted exclusively by absentee ballot for a period of two years preceding March 1970. On the other hand, the record showed no black registrant who had voted exclusively absentee during the same period.[8]

In summary, the district court found that immediately prior to the April 4, 1970 Democratic primary Registrar Bishop purged from the voter rolls a group of predominately black registrants and, at the same time, failed to challenge similarly situated white voters. The court further found that the procedures followed in cancelling the names of the predominately black group were technically deficient under Louisiana law because of failure to give proper notice to the challenged registrants. The court concluded that the number of voters affected by this application of the Louisiana voting statutes was sufficient to have affected the results of the municipal primary. However, the court found no "calculated racially motivated purpose for the acts and omissions of the Registrar."

## INDISPENSABLE PARTIES

For the first time in this litigation appellants raise on this appeal the contention that the candidates nominated in the primaries are indispensable parties under Fed.R.Civ.P. 19 and that this party deficit requires dismissal or remand. This point is without merit. Determinations of indispensability are bottomed on equitable principles. Provi-

dent Tradesmen Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968); Schutten v. Shell Oil Company, 421 F.2d 869 (5th Cir. 1970). These candidates have known of the pendency of this suit practically since its inception, their interests have been fully represented and protected, and their absence will in no way affect the grant of complete relief.

## CONSTITUTIONAL AND STATUTORY VIOLATIONS

The Fifteenth Amendment to the United States Constitution prohibits states from denying or abridging the right of citizens to vote on account of race. The Civil Rights Act of 1870, as amended, 42 U.S.C. § 1971(a) forbids any distinctions based on race in the voting process. And Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, prohibits imposition of any practice or procedure which has the effect of denying or abridging the right of any citizen to vote on account of race or color.

Selective application of laws governing the removal of registrants from voter rolls is a violation of these constitutional and statutory provisions where the effect of such purging is to remove a group which is predominately of one race while leaving unchallenged similarly situated members of another race, notwithstanding the fact that the registration of those challenged could have been legally cancelled under a nondiscriminatory application of the registration statute. United States v. McElveen, 180 F.Supp. 10 (E.D.La.) aff'd sub nom. United States v. Thomas, 362 U.S. 58, 80 S.Ct. 612, 4 L.Ed.2d 535 (1960). In *McElveen* the voter regis-

8. Absentee ballots, cast overwhelmingly for white candidates, have been decisive in many recent elections in Tallulah. For example, in April 4, 1970 Democratic primary, black candidates for each position received a majority of the votes cast at the polls on election day; however, all but two were defeated as a result of heavy absentee balloting which averaged over 6 to 1 for their white opponents. 348 F.Supp. at 194. See also Brown v. Post, *supra*, where the white candidate received 510 absentee ballot votes compared with two for his black opponent, who lost by 169 votes. In that election all 512 absentee ballots were cast by white voters.

trar of Washington Parish, Louisiana, challenged and subsequently cancelled the registration of 1377 black voters and ten white voters. The district court there found that defects and deficiencies similar to those upon which challenges to black registrants were based could have been found in the registration records of over 50% of the white voters in the parish. This evidence was held sufficient to establish a discriminatory and unconstitutional application of the registration statutes requiring injunctive relief.[9]

In the present case, the number of black voters purged from the voting rolls during the month prior to the Democratic primary substantially exceeded the number of white voters purged. Additionally, the plaintiffs have demonstrated that the registrar failed to challenge a significant number of white voters who should have been challenged under a uniform application of the Louisiana voting statutes. At trial, Registrar Bishop offered the following explanations: (a) as to the unchallenged 4-year voters—mere inadvertence accounted for the names overlooked; (b) as to unchallenged changes of address—she relied on lists presented by interested citizens, she did not challenge all blacks whose names were presented to her by white candidates, and she had at other times (though not immediately prior to a contested election) challenged white registrants based on lists presented by black citizens;[10] and (c) as to the failure to challenge continual absentees—she asserted that she was unaware of Section 18:1080 of the Louisiana Statutes since it was omitted from the manual for parish registrars furnished to her by the State Attorney General. However, these explanations must be viewed in light of the uncontested cumulative racial effect of the challenged and non-challenged groups. See Hawkins v. Town of Shaw, 437 F.2d 1286 (5th Cir. 1971), aff'd en banc 461 F.2d 1171 (5th Cir. 1972).

The appellants emphasize the finding by the district court that Mrs. Bishop's actions did not involve any calculated racially motivated purpose. In *McElveen* a similar defense was thus rejected:

The action of the defendant Registrar in giving effect to the mass challenges of the individual defendants achieved a discriminatory result in violation of his duties under the 15th Amendment. Whether or not he had the racially discriminatory purpose which motivated the action of the individual defendants and the defendant Citizens Council is irrelevant as a matter of law. Avery v. State of Georgia, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244.

180 F.Supp. at 14.

■ In short, the record supports the district court's finding that the acts and omissions by Registrar Bishop in the period immediately preceding the April 4, 1970 Democratic primary constituted a violation of the Fifteenth Amendment and the Voting Rights Acts.

### REMEDY

Finding these constitutional and statutory violations of federally guaranteed voting rights, the district court not only ordered prospective relief from similar practices but also voided the prior polling and ordered the holding of a new primary election.

In setting aside the results of the primary balloting, the court below relied on the precedent of its own opinion in Brown v. Post, *supra*, 279 F.Supp. at 64,

---

9. *See also* United States v. Clement, 231 F.Supp. 913 (W.D.La.1964) and United States v. Crawford, 229 F.Supp. 898 (W.D.La.1964) rev'd in regard to remedy, 358 F.2d 89 (5th Cir. 1966); United States v. Wilder, 222 F.Supp. 749 (W.D.La.1963); United States v. Association of Citizens Councils, 196 F.Supp. 908 (W.D.La.1961).

10. The record shows that during her term of office prior to the trial in the court below, Mrs. Bishop removed 1,096 registrants from the voter rolls, 521 white and 575 black. However, prior to March 5, 1970 she had removed more white voters from the registration rolls than blacks.

and thus on the decision of this court in Bell v. Southwell, 376 F.2d 659 (5th Cir. 1967). In *Bell* we stated:

> Drastic, if not staggering, as is the Federal voiding of a State election, and therefore a form of relief to be guardedly exercised, this Court in Hamer v. Campbell, 5 Cir., 1966, 358 F.2d 215, cert. denied, 1966, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79, expressly recognized the existence of this power. Of course as that opinion emphasizes, not every unconstitutional racial discrimination necessarily permits or requires a retrospective voiding of the election.

376 F.2d at 662. See Hamer v. Ely, 410 F.2d 152, 156 (5th Cir.) cert. denied 396 U.S. 942, 90 S.Ct. 372, 24 L.Ed.2d 243 (1969). The appellees contend that the court below acted correctly because *Bell* and subsequent cases establish a two-level standard: (1) where racially discriminatory practices could not have affected the result, the election may be set aside only if the violations were gross and intentional; (2) where the discrimination could have affected the election results, then neither grossness nor intent is relevant. This position misinterprets the standards established in *Bell* and is otherwise unsupported by precedent.

While many factors militate against setting aside a completed state election, the most important being the community's substantial interest in finality and stability in the election process, Bell v. Southwell, *supra*, held that this remedy is appropriate when racial discrimination occurs which is "gross, spectacular, [and] completely indefensible" and no effective judicial remedy is available prior to the holding of the election. 376 F.2d at 664; McGill v. Ryals, D.C., 253 F.Supp. 374, 376–377, appeal dismissed 385 U.S. 19, 87 S.Ct. 212, 17 L.Ed.2d 17 (1966). The present case is altogether different from *Bell*. Here, the acts and omissions of Registrar Bishop were neither flagrant nor grossly discriminatory. Her application of the purge procedures in the period immediately prior to the contested primary, while undoubtedly contrary to the letter and spirit of Louisiana law and in violation of constitutional and statutory rights of black electors because of its effect, cannot be said to have so infected the electoral process as to require that the election be declared void, especially since there was no attempt to seek judicial relief prior to the election.

The activities of the parish registrar and the status of the voter rolls are matters of public record of which the present plaintiffs had constructive if not actual knowledge prior to the election. Thus, the present case did not involve acts of discrimination which occurred during the actual voting process or which were willfully concealed until it was too late for the affected parties to seek pre-election relief. *Compare* Bell v. Southwell, *supra*, 376 F.2d at 664; United States v. Post, *supra*, 297 F.Supp. at 50.

In cases of racial discrimination in voter registration, the federal court system provides a source for prompt, complete and effective relief— including the postponement of elections and the reinstatement of improperly purged voters. See, e.g. Hamer v. Campbell, *supra*, 358 F.2d at 215; United States v. McElveen, *supra*; Gray v. Main, 309 F.Supp. 207 (M.D.Ala.1968). By the same token, where discriminatory practices are known or could be discovered with reasonable diligence, it is the duty of affected parties to bring their grievances forward for prompt pre-election adjudication. Thompson v. Brown, 434 F.2d 1092, 1096 (5th Cir. 1970); Smith v. Paris, 257 F.Supp. 901, 905–906 (M.D.Ala.1966), aff'd as modified 386 F.2d 979 (5th Cir. 1967); McGill v. Ryals, *supra*, 253 F.Supp. at 376. *Cf.* Troxler v. St. John the Baptist Parish Police Jury, 469 F.2d 647 (5th Cir. 1972). The alternative to requiring such prompt action as a prerequisite to relief is to permit if not encourage parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate, then, if they lose, cover their bad bet by undoing the ballot results in a court action. This alternative entails not only a manifest in-

trusion into state political processes, but also requires the court to invoke a presumption which we specifically refused to entertain in *Bell*—that voters, both voting and barred from voting, made or would make their electoral decisions exclusively along racial lines.

The other cases relied on by appellees are inapposite. In Hamer v. Campbell, *supra*, the plaintiffs sought a preliminary injunction several weeks prior to the date set for municipal primaries to delay the impending elections until racially discriminatory practices could be rectified. This Court, reversing the district court's denial of the injunction, stated that "[S]ince the District Court should have enjoined the election in the Town of Sunflower, we have concluded that under the special circumstances of this case we must now require that the District Court again set it aside." 358 F.2d at 222. Perkins v. Mathews, 336 F.Supp. 6 (S.D.Miss.1971) presents an analogous chain of events: In *Perkins* the plaintiffs sought injunctive relief against implementation of new procedures which affected voting in Canton, Mississippi, municipal elections without the approval of the United States Attorney General as required by Section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c. Several months before the impending elections, a three-judge district court denied relief. 301 F.Supp. 565 (S.D.Miss.1969). The Supreme Court, reversing the district court's interpretation of the Voting Rights Act, remanded for a determination of whether a new election should be held, 400 U.S. 379, 395–398, 91 S.Ct. 431, 440–441, 27 L.Ed.

2d 476 (1971). On remand the district court ordered that a new election be held in one ward where, but for the imposition of at-large elections, a different candidate would have been elected. In so doing, the court pointed out that the former election had proceeded only after the federal court had given local officials a green light, albeit under an interpretation of law which was ultimately held to be erroneous, 336 F.Supp. at 9.[11] Thus, in both *Hamer* and *Perkins* granting new elections was necessary to correct an erroneous denial of pre-election relief, a situation which does not exist in the present litigation.[12]

The decisions in Hadnott v. Amos, 394 U.S. 358, 89 S.Ct. 1101, 22 L.Ed.2d 336 (1969) and United States v. The Democratic Executive Committee of Barbour County, 288 F.Supp. 943 (M.D.Ala. 1968), provide no support for the appellee's position that an election may be set aside even where the discriminatory practices are adjudged to be inadvertent or unintentional. In *Hadnott* the Supreme Court ordered a new election in Green County, Alabama to rectify the willful and contemptuous action of a local election officer who had omitted the names of black candidates in defiance of a court order requiring their inclusion. The Barbour County decision is similar to *Hadnott* in that the district court not only found purposeful discrimination against Negroes in violation of the Fourteenth and Fifteenth Amendments but also willful defiance of previous court orders. 288 F.Supp. at 946–948.[13] This, of course, is not such a case. In fact there is no appeal from the district

11. The *Perkins* decision affirms the principle established in Bell v. Southwell, *supra*, that, except in the unusual circumstances such as the erroneous denial of pre-election relief, setting aside a complete election is "required only upon a finding by the Court that gross and indefensible racial discriminatory practices were employed in the election." 336 F.Supp. at 9.

12. Keller v. Gilliam, a reapportionment case, is one-of-a-piece with *Hamer* and *Perkins*. In *Keller* we found that the district court committed "clear error" in permitting an election to be held be-

fore implementing a previously mandated reapportionment plan. Thus we required a new election to be held under the revised apportionment. 454 F.2d 55, 57 (5th Cir. 1972).

13. It should be pointed out that in previous phases of the Barbour County litigation, the district court and this court refused to set aside Executive Committee elections conducted under the racially discriminatory apportionment plan. Smith v. Paris, 257 F.Supp. 901 (M.D. Ala.1966), aff'd as modified 386 F.2d 979 (5th Cir. 1967).

court's finding that the Registrar's acts lacked any calculated discriminatory purpose.

Indeed, the only reported decisions which suggest that a completed election may be set aside, where there is neither a finding of gross, intentional racial discrimination nor a timely pre-election request for injunctive relief, are the previous decisions of this same court involving earlier elections in Madison Parish. Brown v. Post, *supra*, 279 F.Supp. 60 and United States v. Post, *supra*, 297 F.Supp. 46. As we previously noted, neither of these decisions was appealed.

## CONCLUSION

■ The decision of the district court is affirmed to the extent that it orders prospective relief from racial discrimination in registration and voting in Madison Parish, but it is reversed insofar as it declares void the result of the April 4, 1970, primary for Mayor, Board of Aldermen, and Democratic Executive Committee in the Village of Tallulah and orders a new election.

Affirmed, in part.

Reversed, in part.

## ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC

Before JOHN R. BROWN, Chief Judge, and WISDOM, GEWIN, BELL, THORNBERRY, COLEMAN, GOLDBERG, AINSWORTH, GODBOLD, DYER, SIMPSON, MORGAN, CLARK, INGRAHAM and RONEY, Circuit Judges.

## BY THE COURT:

A member of the Court in active service having requested a poll on the applications for rehearing en banc and a majority of the judges in active service having voted in favor of granting a rehearing en banc,

It is ordered that the cause shall be reheard by the Court en banc with oral argument on a date hereafter to be fixed. The Clerk will specify a briefing schedule for the filing of supplemental briefs.