799 F.2d 137
 UNITED STATES of America, Appellant,
v.
CITY OF CAMBRIDGE, MARYLAND; Commissioners of Cambridge,
Maryland; Gorton McWilliams, Jr., Edward Watkins, Guy
Windsor, James Newcomb, Jr., Philip Rice, Commissioners;
Mayor of Cambridge, Maryland; C. Lloyd Robbins, Mayor of
Cambridge, Maryland; Supervisor of Elections of Cambridge,
Maryland and Claude Gootee, Supervisor, Appellees.
 No. 86-3533.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 3, 1986.
Decided Sept. 2, 1986.
 
 Brian K. Landsberg (Marie Klimesz McElderry, Breckinridge L. Willcox, U.S. Atty., William Bradford Reynolds, Asst. U.S. Atty. on brief), for appellant.
 Francis B. Burch, Jr. (Richard M. Matthews, Roger D. Redden, Paul A. Tiburzi on brief), for appellees.
 Before PHILLIPS and SPROUSE, Circuit Judges, and BUTZNER, Senior Circuit Judge.
 SPROUSE, Circuit Judge:
 
 
 1
 The United States appeals from the district court's decision granting the City of Cambridge, Maryland summary judgment on the Government's Voting Rights Act complaint. The Government brought this action in December 1984 alleging that Cambridge's at-large system for electing its commissioners violated section 2 of the Voting Rights Act of 1965, as amended. 42 U.S.C. Sec. 1973 (1982).[1] Without entering into a settlement agreement or conceding the validity of the alleged Voting Rights Act violation, the City in September 1985 adopted a plan for electing commissioners from single-member districts to replace the at-large system at the next regularly scheduled elections in 1988.[2] The City moved for summary judgment and asserted that the new plan mooted the Government's action. The Government opposed the motion because the City had refused to implement the plan in a special election prior to the 1988 elections. The district court, granting the City's motion, held that the failure to hold a special election did not affect the mootness issue because the Government had not requested a special election in its complaint. Alternatively, the court held that even if the Government had requested such relief, its failure to sue prior to the 1984 elections made special election relief inappropriate.
 
 
 2
 The only issue in this appeal is whether the Government should be given an opportunity to prove at trial its right to the remedy of a special election. Because we find that the Government's complaint is not defective and that its failure to sue prior to the 1984 election does not bar the special election remedy, we reverse and remand for further proceedings.
 
 I.
 
 3
 In November 1983, the United States Department of Justice (the Department) received a citizen's complaint that the atlarge system for electing members of the Commissioners of Dorchester County, Maryland violated the Voting Rights Act. The Department began an investigation of the County's election procedures in early 1984. In May 1984, during its investigation of the County's procedures, the United States received collateral information that the City of Cambridge, the county seat of Dorchester County, also used an at-large system for electing its commissioners. A Justice Department attorney conducted a field investigation of both the City's and the County's election practices during the period June 4 to June 9, 1984. He learned that the City would conduct the primary election for commissioners on June 12, 1984 and the general election four weeks later.
 
 
 4
 The United States filed this declaratory judgment action against the City in December 1984, after the Department had completed its investigation. It asked the district court to declare that the City's at-large system violated section 2 of the Voting Rights Act and the fourteenth and fifteenth amendments to the federal Constitution. The Government also asked for an injunction preventing the City from conducting future elections under this system, an order requiring the defendants to devise a plan meeting the requirements of federal law, and for "such relief as the interests of justice may require."
 
 
 5
 The Government alleged in its complaint that the City adopted the at-large plan to dilute the voting strength of its black citizens in violation of the Constitution and the Voting Rights Act.[3] It appears from the record that a 1914 city ordinance required racial segregation of neighborhoods. Each city block was designated "white," "black" or mixed.[4] Even prior to 1914, and at least since 1882, the boundaries of the City's Second Ward encompassed all but one of the black blocks, and, as a result, black electoral participation was essentially confined to the Second Ward. Throughout this century until 1972, the City was governed by a five-member body elected from five single-member wards, of which four were predominantly white and one overwhelmingly black. According to the 1960 census, the predominantly black Second Ward had over ten times as many people as the virtually all-white Third Ward. In 1961, the City redistricted and equalized the population of the four white wards, but left untouched the Second Ward, its most over-populated ward. When it became clear in the late 1960's that a single-member district system satisfying constitutional requirements would mean two black wards, the Commissioners adopted the at-large system. Under this system, only one person from any one ward can serve as a Commissioner and, thus, while a person from the Second Ward serves as a Commissioner, the entire city selects that person.[5]
 
 
 6
 The Government filed its December 1984 suit approximately six and five months after the primary and general elections, respectively. Settlement negotiations began in June 1985. At that time, a Department of Justice attorney advised the City that the Government was seeking a racially fair election plan and a special election implementing the plan. The City maintains that the Department's insistence on a special election during the June settlement negotiations caught it by surprise because the complaint had not specifically requested such relief. In September 1985, the City Commissioners unilaterally adopted a single-member district reapportionment plan and moved for summary judgment.[6] In opposing summary judgment, the Government maintained, as it does on appeal, that a special election was necessary to afford complete relief for the violation alleged in the complaint. The district court rejected that argument and held that the Government had failed to request the special election remedy in the complaint. Relying on Hendon v. North Carolina State Board of Elections, 710 F.2d 177, 182 (4th Cir.1983), it further held that the special election remedy was inappropriate because the Government had failed to sue prior to the 1984 election or to introduce sufficient evidence as to why it had not begun its investigation sooner and filed its action before the election.
 
 II.
 
 7
 The district court stated with respect to the special election remedy that there was "no evidence that such a remedy was ever requested by the Government at the time the parties were negotiating for an election plan that would be in compliance with the Voting Rights Act" and that "it would be extremely unfair to allow the Government to change the complaint in this fashion" after the City had enacted the single-member district plan. We disagree with the district court's conclusion in both respects. First, the City learned during settlement negotiations at least three months before it adopted the new single-member plan that the Government intended to seek special election relief. Second, in addition to the specifically demanded remedies, the complaint asked for "such relief as the interests of justice may require." We, of course, do not consider such a general demand for relief in the abstract but as a part of the entire complaint and in light of the requirements of the Federal Rules of Civil Procedure. Rule 8(f) requires that pleadings shall be construed "so as to do substantial justice". Considering the information uncovered by the Government's investigation and the allegations in its complaint, we feel that these allegations, if proven, might well entitle the Government to a special election.[7]
 
 
 8
 Further support for this general liberal rationale is found in the requirement of Rule 54(c) that a litigant should be awarded the relief merited by his allegations and proof, in the absence of unfair procedural consequences to his adversary. That rule provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Implementation of Rule 54(c), of course, is improper if it allows unfair surprise of a defendant or allows a plaintiff to obtain relief which the defendant has not been called upon to defend. United States v. Pelzer Realty Company, Inc., 377 F.Supp. 121, 123-24 (N.D.Ala.1974), aff'd per curiam, 537 F.2d 841 (5th Cir.1976). In this case, however, the City knew from settlement negotiations three months before it adopted the single-member district plan that the Department of Justice was seeking a special election. Moreover, the alleged discriminatory procedures constitute the kind of serious violation of the Constitution and the Voting Rights Act for which courts have granted immediate relief. See Toney v. White, 488 F.2d 310 (5th Cir.1973) (en banc); Coalition for Education in District One v. Board of Elections of the City of New York, 370 F.Supp. 42 (S.D.N.Y.), aff'd per curiam, 495 F.2d 1090 (2d Cir.1974); United States v. Democratic Executive Committee of Barbour County, Alabama, 288 F.Supp. 943 (M.D.Ala.1968). The City could hardly have been surprised that the government included a special election as one of its settlement demands. True, the complaint would have been much more artfully drawn had it included a specific demand for a special election. Its deficiencies, however, are not sufficient to bar the district court from ordering a special election to implement the single-member district plan if the proof at trial establishes the appropriateness of such relief.
 
 III.
 
 9
 The central issue is whether the Government's failure to sue the City prior to the 1984 elections bars it from seeking a special election. In concluding that such a failure barred the remedy, the district court relied heavily on this court's decision in Hendon. There, we declined to order a ballot recount although certain of the challenged North Carolina election procedures violated the equal protection clause of the fourteenth amendment to the federal Constitution. We based our decision on the failure of Hendon, a congressman defeated for reelection by a small margin, and the other plaintiffs to challenge the procedures prior to the 1982 congressional elections. We were concerned that the "failure to require preelection adjudication would 'permit, if not encourage, parties who could raise a claim to lay by and gamble upon receiving a favorable decision of the electorate and then, upon losing, seek to undo the ballot results in a court action.' " 710 F.2d at 182 (citations omitted).
 
 
 10
 In the case now before us, the district court held that the Government was barred from seeking special election relief because the City's at-large election plan had been in effect since 1969 and the Government had not sued prior to the 1984 election. The district court apparently construed Hendon as establishing a per se rule barring special election relief when the plaintiff did not bring a preelection challenge to the election procedures. Hendon does not set forth a per se rule; rather, courts must examine each such election case against the general rule established in Hendon that a candidate or other election participants should not be allowed to ambush an adversary or subvert the election process by intentionally delaying a request for remedial action to see first whether they will be successful at the polls. In Hendon, private parties with a considerable stake in the outcome of the 1982 congressional election, including one of the candidates, waited until after the election to challenge North Carolina procedures in effect since 1955 for marking and counting split ticket and write-in ballots. The parties there could have brought forward their grievances for preelection adjudication but " 'gamble[d] upon receiving a favorable decision of the electorate....' " Id. at 182. That possibility is not present here because (1) the Government has no interest in who wins or loses the elections in the City; and (2) the Government's interest in the elections is that the election procedures conform with the Constitution and the Voting Rights Act. In this case, there was nothing in the election upon which the Government could gamble. The results of the 1984 election would not vindicate the Government's interest in racially unbiased election procedures because the election plan itself was fatally incompatible with that interest.
 
 
 11
 This is a case in which the Government became aware of a possible Voting Rights Act violation shortly before an election. It investigated the alleged violation and filed suit against the City of Cambridge within six months of its initial awareness of the alleged violation. Given the facts of this case, including the absence of any evidence of bad faith on the part of the Government or of deliberate by-pass of preelection judicial remedies, we believe that the district court incorrectly held that the United States was not entitled to the opportunity of proving at trial its right to a special election remedy.[8] See Toney, 488 F.2d at 315 (burden on election officials to show by clear and convincing proof that there was a deliberate by-pass of preelection judicial remedy).
 
 
 12
 In view of the above, we reverse the decision of the district court and remand for further proceedings.
 
 
 13
 REVERSED AND REMANDED.
 
 
 
 [1]
 42 U.S.C. Sec. 1973 provides:
 (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.
 (b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.
 
 
 [2]
 Commissioners were last elected in 1984, several months prior to the filing of the complaint
 
 
 [3]
 In reviewing a district court's grant of summary judgment, we must, of course, accept the facts as alleged by the nonmoving party and draw all reasonable inferences in its favor. Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir.1985)
 
 
 [4]
 Apparently, there were a total of three blocks in the mixed category
 
 
 [5]
 The Government asserts that the at-large system, therefore, was even more unfair to the black residents of the Second Ward than the previous ward-election system despite its malapportionment because no longer did Second Ward residents alone select their representative; the white majority voting at-large selected a representative from among the Second Ward citizens
 
 
 [6]
 There is no dispute in this case that the City's new plan passes muster under both the Constitution and the Voting Rights Act
 
 
 [7]
 For that matter, if the Government were to prove those allegations at trial, Rule 15(b) of the Federal Rules of Civil Procedure would allow pleadings to be amended as necessary to conform to the evidence and permit a specific demand for the special election remedy
 
 
 [8]
 We, of course, do not hold that the Government may never be barred from seeking a special election remedy by its failure to sue prior to the last election. A different factual situation clearly would arise where the defendant was able to show, for example, bad faith in the Government's decision not to challenge an alleged Voting Rights Act violation until after the community and the candidates had gone to the trouble and expense of an election. We need not, however, determine in this appeal precisely when the Government would be so barred